**No. 26-40061**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

James Bien,

Plaintiff - Appellant

v.

Union Pacific Railroad Company,

Defendant - Appellee

**On Appeal from**
United States District Court for the Eastern District of Texas

4:25-CV-74

**APPELLANT'S RECORD EXCERPTS**

SUBMITTED BY:

Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro

# RECORD EXCERPTS
# TABLE OF CONTENTS

| <u>Tab</u> | <u>Document</u> | <u>Record Citation</u> |
|---|---|---|
| 1 | Docket Sheet | ROA.26-40061.1-7 |
| 2 | Notice of Appeal | ROA.26-40061.544-45 |
| 3 | Third Amended Complaint | ROA.26-40061.282-297 |
| 3.A | Medical Rules | ROA.26-40061.298-309 |
| 3.B | July 30, 2013 letter from Union Pacific to James Bien | ROA.26-40061.310 |
| 3.C | October 13, 2015 letter from Union Pacific to James Bien | ROA.26-40061.311-13 |
| 3.D | Charge of Discrimination | ROA.26-40061.314-15 |
| 3.E | Determination | ROA.26-40061.317-18 |
| 3.F | Notice of Right to Sue | ROA.26-40061.319-20 |
| 4 | Memorandum Opinion and Order | ROA.26-40061.529-543 |

## **CERTIFICATE OF SERVICE**

I certify that on March 29, 2026, I filed an electronic copy of the foregoing document with the Clerk of the United States Court of Appeals for the Fifth Circuit using the court's CM/ECF system, which will serve all counsel of record.

<div align="right">

/s/ Donald E. Uloth
Donald E. Uloth

</div>

Tab 1

APPEAL,CLOSED,JURY,PROTECTIVE-ORDER

Jump to Docket Table

# U.S. District Court
# Eastern District of TEXAS [LIVE] (Sherman)
# CIVIL DOCKET FOR CASE #: 4:25-cv-00074-ALM

Bien v. Union Pacific Railroad Company
Assigned to: Chief District Judge Amos L Mazzant
Case in other court:  Fifth Circuit, 26-40061
Cause: 42:12101 Americans with Disabilities Act

Date Filed: 01/24/2025
Date Terminated: 01/02/2026
Jury Demand: Plaintiff
Nature of Suit: 445 Civil Rights: Americans
with Disabilities - Employment
Jurisdiction: Federal Question

**Plaintiff**

**James Bien**

represented by **Donald Edward Uloth**
Law Office of Donald E. Uloth
18208 Preston Rd
Suite D-9 #261
Dallas, TX 75248
214-989-4396
Fax: 972-777-6951
Email: don.uloth@uloth.pro
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Union Pacific Railroad Company**

represented by **Jimmie L. Pinkham , III**
Baird Holm LLP
1700 Farnam St.
Suite 1500
Omaha, NE 68102
402-344-0500
Fax: 402-344-0588
Email: jpinkham@bairdholm.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aarika Nicolle Johnson**
Constangy, Brooks, Smith & Prophete, LLP
1201 Elm Street
Suite 2550
Dallas, TX 75270
214-646-8625
Email: anjohnson@constangy.com
*TERMINATED: 09/15/2025*

**26-40061.1**

**John Hunter Johnson**
Constangy, Brooks, Smith & Prophete, LLP.
100 Crescent Court
Suite 700
Dallas, TX 75201
214-646-3421
Email: hjohnson@constangy.com
*ATTORNEY TO BE NOTICED*

**Mark Joseph Goldsmith**
Baird Holm LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
402-344-0500
Fax: 402-344-0588
Email: mgoldsmith@bairdholm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott P. Moore**
Baird Holm LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68108
402-344-0500
Email: spmoore@bairdholm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/24/2025 | 1 (p.8) | COMPLAINT against Union Pacific Railroad Company ( Filing fee $ 405 receipt number ATXEDC-10639423.), filed by James Bien. (Attachments: # 1 (p.8) Exhibit Union Pacific's Medical Rules)(Uloth, Donald) (Entered: 01/24/2025) |
| 01/24/2025 | 2 (p.31) | NOTICE *Civil Cover Sheet* by James Bien re 1 (p.8) Complaint (Uloth, Donald) (Entered: 01/24/2025) |
| 01/24/2025 | 3 (p.32) | Fed. R. Civ. P. 7.1(a)(1) Disclosure Statement filed by James Bien identifying Corporate Parent Union Pacific Corporation for James Bien. (Uloth, Donald) (Entered: 01/24/2025) |
| 01/24/2025 | | Case assigned to District Judge Amos L. Mazzant, III. (CLC) (Entered: 01/24/2025) |
| 01/24/2025 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (CLC) (Entered: 01/24/2025) |

| | | |
|---|---|---|
| 01/24/2025 | 4 (p.34) | SUMMONS Issued as to Union Pacific Railroad Company. (CLC) (Entered: 01/24/2025) |
| 01/31/2025 | 5 (p.36) | SUMMONS Returned Executed by James Bien. Union Pacific Railroad Company served on 1/27/2025. (Uloth, Donald) (Entered: 01/31/2025) |
| 02/04/2025 | 6 (p.38) | NOTICE of Attorney Appearance - Pro Hac Vice by Scott P. Moore on behalf of Union Pacific Railroad Company. Filing fee $ 100, receipt number ATXEDC-10658549. (Moore, Scott) (Entered: 02/04/2025) |
| 02/05/2025 | 7 (p.40) | NOTICE of Attorney Appearance - Pro Hac Vice by Jimmie L. Pinkham, III on behalf of Union Pacific Railroad Company. Filing fee $ 100, receipt number ATXEDC-10659882. (Pinkham, Jimmie) (Entered: 02/05/2025) |
| 02/07/2025 | 8 (p.42) | NOTICE of Attorney Appearance - Pro Hac Vice by Mark Joseph Goldsmith on behalf of Union Pacific Railroad Company. Filing fee $ 100, receipt number ATXEDC-10665063. (Goldsmith, Mark) (Entered: 02/07/2025) |
| 02/18/2025 | 9 (p.45) | MOTION to Dismiss *Defendant's Motion to Dismiss Plaintiff's Complaint* by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order Proposed Order Granting Defendant's Motion to Dismiss Plaintiff's Complaint)(Pinkham, Jimmie) (Entered: 02/18/2025) |
| 02/18/2025 | 10 (p.59) | Fed. R. Civ. P. 7.1(a)(1) Disclosure Statement filed by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 02/18/2025) |
| 02/19/2025 | 11 (p.61) | UNOPPOSED MOTION for Extension of Time to File Response/Reply as to 9 (p.45) MOTION to Dismiss *Defendant's Motion to Dismiss Plaintiff's Complaint* by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 02/19/2025) |
| 02/21/2025 | 12 (p.64) | ORDER granting 11 (p.61) UNOPPOSED MOTION for Extension of Time to File Response to 9 (p.45) MOTION to Dismiss *Defendant's Motion to Dismiss Plaintiff's Complaint* . Response due by 3/25/2025. Signed by District Judge Amos L. Mazzant, III on 2/21/2025. (jmb) (Entered: 02/21/2025) |
| 03/11/2025 | 13 (p.65) | FIRST AMENDED COMPLAINT against Union Pacific Railroad Company, filed by James Bien. (Attachments: # 1 (p.8) Exhibit Ex. A U.P.s Medical Rules, # 2 (p.31) Exhibit Ex. B letter to Bien, # 3 (p.32) Exhibit Ex. C Charge of Discrimination, # 4 (p.34) Exhibit Ex. D EEOC Determination, # 5 (p.36) Exhibit Ex. E EEOC Conciliation Failure and Notice of Rights)(Uloth, Donald) (Entered: 03/11/2025) |
| 03/18/2025 | 14 (p.104) | ORDER denied as moot 9 (p.45) Defendant's Motion to Dismiss Plaintiff's Complaint. Signed by Chief District Judge Amos L Mazzant on 3/18/25. (CLC) (Entered: 03/18/2025) |
| 03/21/2025 | 15 (p.105) | ORDER GOVERNING PROCEEDINGS: Rule 26 Meeting Report due by 4/25/2025. Scheduling/Case Management Conference set for 5/9/2025 at 10:00 AM, to be held via Zoom or telephone; instructions will follow, before Chief District Judge Amos L Mazzant. Signed by Chief District Judge Amos L Mazzant on 3/21/2025. (CLC) (Entered: 03/21/2025) |
| 03/25/2025 | 16 (p.115) | MOTION to Dismiss *Plaintiff's Amended Complaint* by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order Proposed Order Granting Defendant's Motion to Dismiss Plaintiff's Amended Complaint)(Pinkham, Jimmie) Modified on 9/15/2025 (CLC). (Entered: 03/25/2025) |
| 04/08/2025 | | |

| | | |
|---|---|---|
| | 17 (p.133) | RESPONSE in Opposition re 16 (p.115) MOTION to Dismiss *Plaintiff's Amended Complaint filed by James Bien*. (Attachments: # 1 (p.8) Exhibit)(Uloth, Donald) (Entered: 04/08/2025) |
| 04/15/2025 | 18 (p.187) | RESPONSE in Support re 16 (p.115) MOTION to Dismiss *Plaintiff's Amended Complaint filed by Union Pacific Railroad Company*. (Pinkham, Jimmie) (Entered: 04/15/2025) |
| 04/22/2025 | 19 (p.197) | NOTICE *of Service of Defendant's Initial Disclosures* by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 04/22/2025) |
| 04/25/2025 | 20 (p.200) | JOINT REPORT of Rule 26(f) Planning Meeting. (Uloth, Donald) (Entered: 04/25/2025) |
| 05/06/2025 | | The Court hereby CANCELS the May 9, 2025 Scheduling Conference; the Court will enter a Scheduling Order. (No attachment) (tls) (Entered: 05/06/2025) |
| 05/30/2025 | 21 (p.208) | SCHEDULING ORDER: Final Pretrial Conference set for 3/5/2026 at 09:00 AM in Ctrm 208 (Sherman) before Chief District Judge Amos L Mazzant. Amended Pleadings due by 8/1/2025. Discovery due by 10/24/2025. Joinder of Parties due by 6/20/2025. Jury instructions due by 2/19/2026. Mediation Completion due by 9/1/2025. Motions due by 10/10/2025. Proposed Pretrial Order due by 2/3/2026. Signed by Chief District Judge Amos L Mazzant on 5/30/2025. (rpc) (Entered: 05/30/2025) |
| 06/30/2025 | 22 (p.214) | UNOPPOSED MOTION for Extension of Time to File *Expert Witness Disclosures* by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 06/30/2025) |
| 07/01/2025 | 23 (p.221) | ORDER granting 22 (p.214) Motion to Extend the Deadlines for Expert Witness Disclosures. Signed by Chief District Judge Amos L Mazzant on 7/1/2025. (CLC) (Entered: 07/01/2025) |
| 07/21/2025 | 24 (p.222) | JOINT MOTION Modification of the Mediation Deadlines in the Scheduling Order by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 07/21/2025) |
| 07/31/2025 | 25 (p.227) | ORDER granting 24 (p.222) JOINT MOTION to Modify Mediation Requirements in the Scheduling Order filed by James Bien. Mediation Completion due by 2/20/2026. Designation of Mediator due by 1/2/2026. Signed by Chief District Judge Amos L Mazzant on 7/31/2025. (CLC) (Entered: 07/31/2025) |
| 08/01/2025 | 26 (p.228) | UNOPPOSED MOTION for Extension of Time to Amend *Plaintiff's Pleadings* by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 08/01/2025) |
| 08/06/2025 | 27 (p.231) | NOTICE *of Service of Discovery Requests* by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 08/06/2025) |
| 08/06/2025 | 28 (p.233) | ORDER granting 26 (p.228) UNOPPOSED MOTION for Extension of Time to File a Motion for Leave to Amend Complaint filed by James Bien. The new deadline for Plaintiff to file amended pleadings (with a motion for leave to amend) is August 15, 2025. Signed by Chief District Judge Amos L Mazzant on 8/6/2025. (CLC) (Entered: 08/06/2025) |
| 08/15/2025 | 29 (p.234) | OPPOSED MOTION for Leave to File *an Amended Complaint* by James Bien. (Attachments: # 1 (p.8) Exhibit Plaintiff's 3d Amended Complaint)(Uloth, Donald) |

| | | |
|---|---|---|
| | | (Additional attachment(s) added on 8/15/2025: # 2 (p.31) Proposed Order) (CLC). (Entered: 08/15/2025) |
| 08/15/2025 | 30 (p.281) | NOTICE *of filing Proposed Order concerning Dkt #29.* by James Bien (Uloth, Donald) (Entered: 08/15/2025) |
| 08/15/2025 | 31 (p.282) | THIRD AMENDED COMPLAINT against James Bien, filed by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 08/15/2025) |
| 08/15/2025 | 32 (p.325) | NOTICE *of Service of Defendant's Discovery Responses to Plaintiff* by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 08/15/2025) |
| 09/10/2025 | 33 (p.328) | UNOPPOSED MOTION to Withdraw as Attorney *Aarika Johnson* by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order Motion to Withdraw)(Johnson, John) (Entered: 09/10/2025) |
| 09/11/2025 | 34 (p.332) | ORDER granting 29 (p.234) Motion for Leave to Amend Complaint; and finding as moot 16 (p.115) Motion to Dismiss Plaintiff's Amended Complaint. Signed by Chief District Judge Amos L Mazzant on 9/11/2025. (CLC) (Entered: 09/11/2025) |
| 09/15/2025 | 35 (p.333) | ORDER granting 33 (p.328) Motion to Withdraw Counsel filed by Defendant Union Pacific Railroad Company. It is ORDERED that Aarika N. Johnson is hereby withdrawn as attorney of record for Defendant and discharged from any further responsibility to Defendant Union Pacific Railroad Company in this matter. Signed by Chief District Judge Amos L Mazzant on 9/15/2025. (CLC) (Entered: 09/15/2025) |
| 09/15/2025 | 36 (p.334) | ORDER. It is ORDERED that the Clerk shall REINSTATE Defendant Union PacificRailroad Company's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. # 16 (p.115) ) as a motion pending before the Court. Signed by Chief District Judge Amos L Mazzant on 9/15/2025. (CLC) (Entered: 09/15/2025) |
| 09/22/2025 | 37 (p.335) | NOTICE *of Deposition of James Bien* by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 09/22/2025) |
| 09/23/2025 | 38 (p.337) | NOTICE *of Service of Supplemental Initial Disclosures* by Union Pacific Railroad Company (Pinkham, Jimmie) (Entered: 09/23/2025) |
| 09/24/2025 | 39 (p.339) | UNOPPOSED MOTION to Amend/Correct 21 (p.208) Scheduling Order/Docket Control Order, by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order)(Pinkham, Jimmie) (Entered: 09/24/2025) |
| 10/10/2025 | 40 (p.345) | UNOPPOSED MOTION to Seal *Summary Judgment Exhibits* by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order)(Pinkham, Jimmie) (Entered: 10/10/2025) |
| 10/10/2025 | 41 | MOTION for Summary Judgment *and Memorandum* by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Declaration of J Pinkham, # 2 (p.31) Exhibit A, # 3 (p.32) Exhibit B, # 4 (p.34) Exhibit C, # 5 (p.36) Exhibit D, # 6 (p.38) Exhibit E, # 7 (p.40) Exhibit F, # 8 (p.42) Exhibit G, # 9 (p.45) Exhibit H, # 10 (p.59) Exhibit A1, # 11 (p.61) Exhibit A7, # 12 (p.64) Exhibit A8, # 13 (p.65) Exhibit A9, # 14 (p.104) Exhibit A10, # 15 (p.105) Exhibit A11, # 16 (p.115) Exhibit A16, # 17 (p.133) Proposed Order)(Pinkham, Jimmie) (Entered: 10/10/2025) |
| 10/10/2025 | 42 (p.349) | UNOPPOSED MOTION to Seal Document *(Exhibit 2 in support of Plaintiff's Motion for Partial Summary Judgment)* by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 10/10/2025) |

| | | |
|---|---|---|
| 10/10/2025 | 43 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 42 (p.349) UNOPPOSED MOTION to Seal Document *(Exhibit 2 in support of Plaintiff's Motion for Partial Summary Judgment)*. (Uloth, Donald) (Entered: 10/10/2025) |
| 10/10/2025 | 44 (p.352) | MOTION for Summary Judgment *(Partial) on FRA Exhaustion Defense* by James Bien. (Attachments: # 1 (p.8) Exhibit, # 2 (p.31) Exhibit, # 3 (p.32) Exhibit, # 4 (p.34) Exhibit, # 5 (p.36) Exhibit, # 6 (p.38) Proposed Order)(Uloth, Donald) (Entered: 10/10/2025) |
| 10/10/2025 | 45 (p.384) | SEALED ADDITIONAL ATTACHMENTS to Main Document: 40 (p.345) UNOPPOSED MOTION to Seal *Summary Judgment Exhibits*. (Attachments: # 1 (p.8) Exhibit A2, # 2 (p.31) Exhibit A3, # 3 (p.32) Exhibit A4, # 4 (p.34) Exhibit A5, # 5 (p.36) Exhibit A6, # 6 (p.38) Exhibit A12, # 7 (p.40) Exhibit A13, # 8 (p.42) Exhibit A14, # 9 (p.45) Exhibit A15, # 10 (p.59) Exhibit I, # 11 (p.61) Proposed Order)(Pinkham, Jimmie) (Entered: 10/10/2025) |
| 10/10/2025 | 46 (p.386) | JOINT MOTION for Protective Order by Union Pacific Railroad Company. (Attachments: # 1 (p.8) Proposed Order)(Pinkham, Jimmie) (Entered: 10/10/2025) |
| 10/17/2025 | 47 (p.402) | ORDER granting in part and denying in part 39 (p.339) Motion to Modify the Scheduling Order filed by Union Pacific Railroad Company. Discovery due by 12/16/2025. Signed by Chief District Judge Amos L Mazzant on 10/17/2025. (CLC) (Entered: 10/17/2025) |
| 10/17/2025 | 48 (p.403) | ORDER granting 40 (p.345) Motion to Seal Exhibits A2-A6, A12-A15 and Ex. I to Defendant's Motion for Summary Judgment (Dkt. # 45 (p.384) ). Signed by Chief District Judge Amos L Mazzant on 10/17/2025. (CLC) (Entered: 10/17/2025) |
| 10/17/2025 | 49 (p.404) | ORDER granting 42 (p.349) Motion to File Summary Judgment Exhibit Under Seal. Signed by Chief District Judge Amos L Mazzant on 10/17/2025. (CLC) (Entered: 10/17/2025) |
| 10/17/2025 | 50 (p.405) | PROTECTIVE ORDER. Signed by Chief District Judge Amos L Mazzant on 10/17/2025. (CLC) (Entered: 10/17/2025) |
| 10/27/2025 | 51 (p.419) | JOINT MOTION for Extension of Time to File Response/Reply *to Motions for Summary Judgment* by James Bien. (Attachments: # 1 (p.8) Proposed Order)(Uloth, Donald) (Entered: 10/27/2025) |
| 10/30/2025 | 52 (p.424) | ORDER granting 51 (p.419) Motion for Extension of Time to Respond to 44 (p.352) MOTION for Summary Judgment *(Partial) on FRA Exhaustion Defense*, 41 MOTION for Summary Judgment *and Memorandum* Responses due by 11/10/2025. Signed by Chief District Judge Amos L Mazzant on 10/30/2025. (CLC) (Entered: 10/30/2025) |
| 11/10/2025 | 53 | ***DISREGARD PER ATTORNEY - FILED IN INCORRECT CASE*** NOTICE *of Service of Discovery Requests to Plaintiff* by Union Pacific Railroad Company (Pinkham, Jimmie) Modified on 11/10/2025 (mmc). (Entered: 11/10/2025) |
| 11/10/2025 | 54 (p.425) | RESPONSE in Opposition re 44 (p.352) MOTION for Summary Judgment *(Partial) on FRA Exhaustion Defense filed by Union Pacific Railroad Company*. (Attachments: # 1 (p.8) Affidavit/Declaration Cecil Copeland, # 2 (p.31) Affidavit/Declaration Jason Taullie)(Pinkham, Jimmie) (Entered: 11/10/2025) |
| 11/10/2025 | 55 (p.445) | RESPONSE in Opposition re 41 MOTION for Summary Judgment *and Memorandum filed by James Bien.* (Attachments: # 1 (p.8) Exhibit Bien Declaration |

26-40061.6

| | | |
|---|---|---|
| | | plus exs. 1-A, 1-B and 1-C, # 2 (p.31) Exhibit Uloth Declaration plus exs. 2-A, 2-B, and 2-C)(Uloth, Donald) (Additional attachment(s) added on 11/12/2025: # 3 (p.32) Proposed Order) (CLC). (Entered: 11/10/2025) |
| 11/17/2025 | 56 (p.501) | REPLY to Response re 41 MOTION for Summary Judgment *and Memorandum filed by Union Pacific Railroad Company*. (Goldsmith, Mark) (Entered: 11/17/2025) |
| 11/17/2025 | 57 (p.514) | REPLY to Response re 44 (p.352) MOTION for Summary Judgment *(Partial) on FRA Exhaustion Defense filed by James Bien*. (Uloth, Donald) (Entered: 11/17/2025) |
| 11/24/2025 | 58 (p.520) | SUR-REPLY to Reply to Response re 41 MOTION for Summary Judgment *and Memorandum filed by James Bien*. (Uloth, Donald) (Entered: 11/24/2025) |
| 01/02/2026 | 59 (p.529) | MEMORANDUM OPINION AND ORDER. It is ORDERED that Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. # 16 (p.115) ) is hereby GRANTED and the case is hereby DISMISSED with prejudice. All pending motions not previously addressed by the Court are DENIED as moot. Signed by Chief District Judge Amos L Mazzant on 1/2/2026. (CLC) (Entered: 01/02/2026) |
| 01/29/2026 | 60 (p.544) | NOTICE OF APPEAL as to 59 (p.529) Memorandum & Opinion,, Order Dismissing Case, by James Bien. Filing fee $ 605, receipt number ATXEDC-11338484. (Uloth, Donald) (Entered: 01/29/2026) |
| 02/09/2026 | 61 (p.546) | NOTICE of Docketing Notice of Appeal from USCA re 60 (p.544) Notice of Appeal filed by James Bien. USCA Case Number 26-40061. (CLC) (Entered: 02/10/2026) |

Tab 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| James Bien, | § | |
| | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:25-cv-00074-ALM |
| | § | JURY |
| Union Pacific Railroad Company, | § | |
| | § | |
|     Defendant. | § | |

## NOTICE OF APPEAL

Plaintiff hereby appeals to the United States District Court of Appeals for the Fifth Circuit from the January 2, 2026 Memorandum Opinion and Order (Dkt. # 59) granting Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. #16) and dismissing the case with prejudice.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

1

## <u>CERTIFICATE OF SERVICE</u>

On January 29, 2026, I filed the foregoing document with the Clerk of the U.S. District Court for the Eastern District of Texas using the court's electronic filing system, which constitutes service on all parties under Rule 5(b) of the Federal Rules of Civil Procedure.

/s/ Donald E. Uloth
Donald E. Uloth

26-40061.545

Tab 3

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

James Bien,

  Plaintiff,

v.

Union Pacific Railroad Company,

  Defendant.

§
§
§
§
§
§
§
§
§
§

Case No. 4:25-cv-00074-ALM
JURY

## THIRD AMENDED COMPLAINT

 Plaintiff James Bien ("Bien") complains of Defendant Union Pacific Railroad Company ("Union Pacific" or "Defendant") for violations of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA").

### Parties

1. Bien resides in Brownsboro, Texas. He was an employee of Union Pacific, working in Longview, Texas.

2. Union Pacific is a railroad carrier engaged in interstate commerce. It has operations in Longview, Texas, and it is headquartered in Omaha, Nebraska. Defendant has appeared in this lawsuit through its attorneys, so it may now be served by serving its attorneys of record.

### Jurisdiction and Venue

3. This court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331.

1

26-40061.282

4.      This Court has personal jurisdiction over Defendant because it does a substantial amount of business in Texas, and it has sufficient minimum contacts with the State of Texas to allow this Court to exercise personal jurisdiction over the Defendant in this case.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is also proper in this Court under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices alleged herein occurred in the State of Texas, and because Bien would have continued to work in counties which comprise the Sherman Division if not for the unlawful employment practices complained of herein.

<div align="center"><b>Exhaustion of Administrative Remedies</b></div>

6.      As described in greater detail below, Plaintiff exhausted administrative remedies and complied with all procedural prerequisites to filing this lawsuit by dual filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Civil Rights Division, and he has received a notice of his right to sue from the EEOC.

7.      Bien was not required to exhaust the administrative review process established by the Federal Railway Administration.  This process is optional, and conductors who are denied recertification are not required to pursue this process before asserting claims under the ADA.  Furthermore, even if the process was mandatory, exhaustion of these administrative remedies is not jurisdictional and would not bar a conductor from pursuing an ADA claim.  Additionally, Union Pacific did not notify Bien that it was denying or had denied his recertification as a conductor, so Bien had no certification decision to appeal through this administrative review process, making an exhaustion requirement not applicable.

<div align="center">2</div>

26-40061.283

**Relevant Facts**

*Bien's employment, and his color vision testing history*

8.      Union Pacific hired Bien in 1998 as a switchman/brakeman.

9.      Before hiring Bien, Union Pacific had him take a pre-employment physical that included hearing and vision testing.  Bien did not pass an Ishihara color vision test that was administered as part of the pre-employment testing, but at Union Pacific's request he made arrangements to take a Farnsworth color vision test, which he passed.  Union Pacific received the test results from this Farnsworth test and allowed Bien to begin work as a switchman/brakeman.

10.      Bien later became a conductor, and for close to 15 years he worked ably and safely, in and around trains, as a thru freight conductor based in Longview, Texas.

11.      Every two or three years, Union Pacific retested Bien's color vision.  Each time, Bien's color vision was first tested using the Ishihara test, which Bien failed.  Union Pacific would then test Bien's color vision using a field test where he and a supervisor walked around Union Pacific's train yard in Longview, and Bien identified the colors of wayside (track-side) signals that were used to control the movement of trains in the yard.  Each time, after passing the second test, Union Pacific recertified Bien as a conductor and he was allowed to continue working.

12.      Union Pacific received and had in its possession records of all vision tests and test results from the tests described above.

*Union Pacific's fitness-for-duty policies and practices*

13.      Union Pacific had Medical Rules that outlined its Fitness-for-Duty program and the fitness-for-duty evaluations conducted on employees.  A copy of the Medical Rules that went into effect as of February 1, 2014 is attached to this Amended Complaint as <u>Exhibit A</u>.

14.      By design, the rules are standardized, which means the fitness-for-duty evaluations

3

are often not truly individualized assessments of an employee's ability to safely perform the essential functions of the employee's job. Union Pacific then imposes standardized work restrictions, as opposed to restrictions tailored to the individual and the applicable situation.

15. Because of its rigid and formulaic approach to assessing the abilities of persons with disabilities, many Union Pacific employees who have never had a problem performing the essential functions of their jobs have been removed from work without pay, and/or forced to disclose sensitive health and medical information. Many, like Bien, have been deprived of their livelihoods, as explained below.

***Union Pacific imposed a one-size-fits-all work restriction on Bien, which cost him his job***

16. In 2013, as part of his Federal Railroad Administration (FRA) certification as a conductor, Union Pacific arranged for Bien to take the Ishihara color vision test, which he failed. Union Pacific received copies of the tests results, which it later relied on to make the employment decisions complained of herein. Bien was not removed from service at this time.

17. On or about July 25, 2013, Union Pacific required Bien to take a color vision field test. This time, however, Bien was sent to a different location, in Fort Worth, for a different kind of field test.

18. In all prior field tests, Union Pacific used multiple wayside signals that were in use controlling the movement of trains; these were signals that Bien actually encountered on the job as a conductor. In Fort Worth, Union Pacific used just one signal for the test, and it was not like the ones Bien encountered on the job. It was an older type of signal that was not as bright, and less clear. Furthermore, the signal used for this test in Fort Worth was not in use, actually controlling the movement of trains. This field test, therefore, did not replicate Bien's working conditions.

4

19.     In prior tests, Bien's eyes were level (or close to level) with the signals he was asked to identify.  In Fort Worth, the signal was on top of an overpass, and Bien was standing on the ground, so he was looking up at an angle, unlike all prior tests where Bien's eye level was close to the same level as the signals he was asked to identify.  The angle was also unlike the angle at which Bien viewed signals when he was on the job, sitting in the cab of a locomotive approximately 18-20 feet above the ground.

20.     In prior tests, Bien was asked to look at multiple signals all around him, so the angle of the sun was different for each signal.  In Fort Worth, both Bien and the signal were in fixed locations, and the sun was shining on the lenses, washing out the colors and making them difficult to identify.

21.     Furthermore, Union Pacific failed to follow its own standards and testing protocols for the July 25, 2013 color vision field test.  For example, there was no signal maintainer present to make sure the signal being used for the test was working properly, and the instructions were not read to Bien before the test.  The test was therefore unreliable, and not an accurate test of Bien's ability to detect the color of the wayside train signals Bien actually encountered when doing his job as a conductor.

22.     Union Pacific informed Bien that he failed this test.  Bien did not fail this test due to a color vision deficiency; he failed because it was a flawed test, and because the test results were misinterpreted as an indication of a disqualifying color vision deficiency by Union Pacific's medical director.

23.     Bien's color vision did not change during his employment with Union Pacific, and it had not gotten worse in between the 2013 tests and the color vision field test he had taken and passed just two or three years before.

5

26-40061.286

24.     Union Pacific had and relied on the test results from the 2013 tests when it made the employment decisions complained of herein.

25.     Based on Bien's vision tests, up to and including the 2013 Ishihara test and the July 25, 2013 color vision field test, Union Pacific had in its possession documents indicating to it that Bien was substantially impaired with respect to the major life activities of seeing and seeing in color.   The facts alleged herein also show that Union Pacific regarded Bien as having an impairment that affected his ability to see and to see in color.

26.     Bien was nevertheless allowed to keep working after the first of these color vision field tests, and he served as a conductor on moving trains on July 27 and July 29, 2013, safely and without incident.

27.     On July 29, 2013, Bien was informed that he was being removed from service.

28.     By certified mail letter dated July 30, 2013, Bien was informed: "You are not to perform jobs requiring color signal recognition.  This is to advise that this restriction cannot be accommodated.   If updated medical information is received, we will be glad to have the information reviewed and obtain another fitness-for-duty decision."  A true and correct copy of this July 30, 2013 letter is attached to this Amended Complaint as Exhibit B.

29.     Records also indicate that Union Pacific did the same color vision field test on Bien again on August 20, 2013, and once again Union Pacific concluded that Bien did not pass the test.

30.     Union Pacific never notified Bien that he was being denied recertification as a conductor, and it never notified Bien that he could file a petition for review of a certification decision with the Federal Railroad Administrator.

31.     Bien's ability to detect the color of wayside train signals was not impaired, and he had worked as a conductor for years without any difficulty performing this function.  But even if

6

26-40061.287

Union Pacific had reason to believe Bien was impaired with respect to this job function, there was a reasonable accommodation available that should have eliminated any cause for concern. Bien could have worn chromatic lenses, which improve a person's ability to discern certain colors.

32. Union Pacific would not allow Bien to use chromatic lenses for either of the 2013 color vision field tests, or while working as a conductor, although there was no legal impediment to doing so.

33. No doctor employed by or affiliated with Union Pacific ever examined Bien. Defendant made its decisions based on its interpretation of the information contained in documents concerning Bien's color vision.

34. Bien's job as a conductor required color signal recognition, so the work restriction ended his employment as a conductor.

35. Union Pacific made no attempt to engage in an interactive process to determine if reasonable accommodations were necessary, and if so, whether reasonable accommodation were feasible.

36. Bien was a union employee, and his union commenced proceedings seeking to have Bien reinstated to his job as a conductor. These were ultimately unsuccessful.

37. After being removed from service, Bien applied for several other positions within Union Pacific. After several months of unemployment with no income, Bien was hired as a Manager of Crew Utilization, for less pay.

***Union Pacific's 2015 fitness-for-duty decision based on updated medical information***

38. In 2015, probably in August or September, Bien received a computer notification from Union Pacific about doing an FRA (Federal Railroad Administration) recertification physical. Bien was evidently still certified by Union Pacific as a conductor.

7

26-40061.288

39.     On September 17, 2015, as part of the FRA recertification, Bien took an Ishihara color vision test.  Bien passed this test, correctly identifying 14 out of 14 Ishihara plates.  This was a "reportable health event" as this term is defined in Union Pacific's Medical Rules.

40.     Based on this event, and with new and updated medical information, Bien asked Union Pacific to have the information reviewed, as it promised it would do if updated medical information became available.  Bien asked Union Pacific to let him retake the color vision field test, to review his work restriction, and to reinstate him to his position.

41.     A Union Pacific committee then reviewed the updated medical information and made a fitness-for-duty decision declaring him unfit for duty.  Union Pacific informed Bien of this decision by letter dated October 13, 2015.  A true and correct copy of this letter is attached to this Amended Complaint as Exhibit C.

42.     The letter shows Bien had a "record of" a color vision impairment that was substantially limiting with respect to the major life activity of seeing (thus satisfying one definition of the term "disability"), and it shows that Union Pacific regarded Bien as having an impairment (satisfying the "regarded as" definition of a "disability").  For example, the letter states: "You have been given permanent work restrictions due to your documented color vision deficiency, which poses significant and imminent safety risks for you and others if you work as a train crew member."  This proves Defendant removed Bien from his position because of what it perceived to be an impairment with respect to a major life activity – because it regarded him as having a color vision impairment.

43.     The letter went on to say that Bien's requests had been formally reviewed by a committee, and his requests were being denied.  The letter dismissed the importance of the passed Ishihara test by stating: "There are multiple reasons a person with significant color vision

8

deficiency can inadvertently pass a 14-plate Ishihara test." This indicates assumptions on the part of Union Pacific: that Bien had a significant visual impairment, he should have failed the test because of the impairment, and he only passed the test inadvertently.

44.     The letter also described another assumption Union Pacific was making – the company would assume that Bien had a hereditary and permanent color vision deficiency unless Bien showed three things: (1) that an eye condition contributed to his past color vision deficiency, (2) that treatment has improved the condition, and (3) that his color vision is and will remain normal.

45.     As of October 13, 2015, Bein's union was still pursuing its efforts to have Bien reinstated to his job as a conductor. However, the decisions and actions announced in Union Pacific's October 13, 2015 letter fundamentally changed the status quo of the employer-employee relationship. Before this letter, Union Pacific was willing to reconsider the restrictions, and Bien's reinstatement to his position as a conductor was a real possibility. After this letter, Bien's reinstatement was no longer possible because Union Pacific firmly stated it would not allow Bien to retake the field test, and it was now requiring Bien to prove that his color vision would remain normal in the future, which would be impossible to prove.

46.     Bien remains capable of working as a conductor for Union Pacific to this day. He has been prevented from working only because of Union Pacific's mistaken assumptions about his abilities, and its unfounded fear that Bien poses a significant and imminent safety risk to himself and others if he works as a conductor.

***Bien's claims are not barred by limitations because of American Pipe tolling***

47.     Bien's claims are not barred by limitations because of a class action lawsuit that tolled limitations from September 18, 2014 through March 24, 2020. *See Harris et al. v. Union*

9

*Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

48.    Bien was a putative class member in the *Harris* case because he falls within the class as originally defined, and because the claims being asserted herein accrued after September 18, 2014.  Bien's disability discrimination claims have therefore been subject to tolling pursuant to the Supreme Court's rulings in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

49.    The Court certified the *Harris* case as a class action in February 2019, using a definition of the class that differed slightly from the earlier definition.  Bien continued to be a member of the class action as certified by the district court.

50.     The Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

51.    As a result of *American Pipe* tolling, Bien still had time left after the date of the Eighth Circuit's order to timely file a charge of discrimination with the EEOC. Furthermore, shortly after the Eighth Circuit issued its order reversing class certification, the parties in the *Harris* case entered into a tolling agreement, extending the statute of limitations for Bien's and other putative class members' claims by an additional sixty (60) days.

52.    On April 10, 2020, Bien timely dual-filed a charge of discrimination with the EEOC and the Texas Workforce Commission, Civil Rights Division.  A true and correct copy of this charge is attached to this Amended Complaint as Exhibit D.

53.    On September 3, 2024, the EEOC issued a Determination finding reasonable cause to believe Union Pacific discriminated against Bien because of disability.  A true and correct copy of this Determination is attached to this Amended Complaint as Exhibit E.

54.    On October 28, 2024, the EEOC issued a Conciliation Failure and Notice of

10

Rights informing him he had the right to sue Union Pacific. A true and correct copy of this document is attached to this Amended Complaint as Exhibit F.

55. Bien timely filed this lawsuit on January 24, 2025, asserting claims based on the 2015 events described above in paragraphs 27-35. Bien is not asserting claims based on his removal from service in 2013. Bien now files this Amended Complaint as a matter of course pursuant to Rule 15(a)(B) of the Federal Rules of Civil Procedure.

**First Cause of Action - 42 U.S.C. § 12112(a)**
**Disparate Treatment Disability Discrimination**

56. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

57. At all relevant times, Bien was an individual with a disability under 42 U.S.C. § 12102(1)(B) and (C). Union Pacific made its decisions based on medical records and information in the actual possession of the company, records that indicated to Union Pacific that Bien had a color vision impairment that was substantially limiting with respect to the major life activity of seeing. The facts therefore show Bien had a disability under the "record of" and "regarded as" definitions. Bien is not alleging that he had an actual disability under subsection (A).

58. At all relevant times, Bien had the requisite skill, experience, education, and other job-related requirements of his position, and he was therefore a qualified individual under the ADA.

59. At all relevant times, Bien could safely perform the essential functions of his position, with or without reasonable accommodations.

60. Section 12112(a) of the ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

11

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

61.     Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

62.     Union Pacific discriminated against Bien on the basis of disability in 2013 when it imposed permanent work restrictions that caused Bien to lose his job and his income, and by refusing to employ one or more reasonable accommodations that would have eliminated Union Pacific's mistaken concerns about Bien's color vision abilities.  However, this decision remained subject to reconsideration and change.

63.     Union Pacific performed a new and independent act of discrimination against Bien in 2015.  In 2015, Bien was still an employee of Union Pacific.  He was represented by a union, so he had rights under a Collective Bargaining Agreement.  One of his rights was the right to return to work as a conductor upon receiving a favorable fitness for duty determination from Union Pacific's Health and Medical Services department.  When Union Pacific removed Bien from his position in 2013, it promised to consider updated medical information and obtain another fitness-for-duty decision.  In 2015, Bien provided updated medical information.  A Union Pacific committee reviewed the information, it made a new fitness-for-duty determination, and unlike 2013, this time Union Pacific foreclosed the possibility of reconsideration and reinstatement by stating conditions that were impossible to meet (*e.g.* proof his color vision would never change).

64.     In 2015, Bien was subjected to a fitness-for-duty determination, and he was

26-40061.293

subjected to a new and independent adverse employment action as a result of this determination. These facts show Bien is squarely within the definition of the class certified by the district court in the *Harris* case.

65. Because Union Pacific violated 42 U.S.C. § 12112, Bien has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Bien is also entitled to attorneys' fees and costs incurred in connection with these claims.

66. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Bien. As a result, Bien is entitled to punitive damages.

<div align="center">

**Second Cause of Action - 42 U.S.C. § 12112(b)(6)**
**Disparate Treatment Disability Discrimination**

</div>

67. Bien is a qualified individual with a disability under the ADA.

68. Discriminating against a qualified individual on the basis of disability includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

69. Discriminating against a qualified individual on the basis of disability also includes "utilizing standards, criteria or methods of administration . . . that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3).

70. Union Pacific discriminated against Bien on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Bien.

71. Union Pacific's qualification standards are neither job-related nor consistent with

<div align="center">13</div>

business necessity.

72. Union Pacific uses qualification standards that screen out and tend to screen out individuals with disabilities.

73. Because Union Pacific violated 42 U.S.C. § 12112, Bien has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Bien is also entitled to attorneys' fees and costs incurred in connection with these claims.

74. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Bien. As a result, Bien is entitled to punitive damages.

## Equitable and Injunctive Relief

75. Defendant intentionally engaged in the unlawful employment practices described in this Amended Complaint. This Court may therefore enjoin Defendant from engaging in such unlawful employment practices, and order other equitable relief as this Court deems appropriate.

76. Bien therefore requests an award of injunctive relief prohibiting Defendant from further engaging in the unlawful employment practices described in this Amended Complaint.

77. Bien also requests reinstatement to his position, with back pay.

## Jury Demand

78. Plaintiff demands a trial by jury on all claims asserted in this Amended Complaint for which a trial by jury is allowed by law.

## Prayer for Relief

**WHEREFORE,** Plaintiff requests judgment against Defendant as follows:

a. Judgment finding that the unlawful actions described in this Amended Complaint constitute violations of the ADA;

14

26-40061.295

b. Judgment enjoining Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages described in this Amended Complaint;

c. Judgment awarding Plaintiff all compensable damages, including all economic losses, lost past and future income and benefits of employment, and compensatory damages such as suffering, mental anguish, emotional distress, inconvenience, loss of personal status and dignity, and loss of enjoyment of life;

d. Judgment awarding all costs of court, expert witness fees, and attorney fees recoverable by law;

e. Judgment awarding punitive damages;

f. Judgment awarding such other relief under the ADA to which Plaintiff is entitled by law;

g. Judgment awarding all pre-judgment and post-judgment interest to which Plaintiff is entitled by law;

h. Judgment awarding all other and further relief to which Plaintiff is entitled.

Respectfully submitted,

/s/ Donald E. Uloth
Donald E. Uloth
Texas Bar No. 20374200
Law Office of Donald E. Uloth
18208 Preston Rd. Suite D-9 # 261
Dallas, Texas 75252
Phone: (214) 989-4396
Email: don.uloth@uloth.pro
Counsel for Plaintiff

15

## CERTIFICATE OF SERVICE

On August 15, 2025, I filed the foregoing document with the Clerk of the U.S. District Court for the Eastern District of Texas using the court's electronic filing system, which constitutes service on all parties under Rule 5(b) of the Federal Rules of Civil Procedure.

/s/ Donald E. Uloth
Donald E. Uloth

# Tab A

12/5/2015

MyUP

### Medical Rules

Roles and Responsibilities

Fitness-for-Duty Evaluations

Health and Medical Services

Fitness-for-Duty Decisions

Medical Records and

Confidentiality of Medical

Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health

Events

# Medical Rules

The Medical Rules are established to determine employees' Fitness-for-Duty. Health and Medical Services determines "Fitness for Duty" as the medical and functional, (i.e., physical, mental, and cognitive) ability to:

In addition to the Medical Rules, employees must also be aware of **Related Policies and Programs**.

Safely perform a job, with or without reasonable accommodations, and

Meet medical standards established by regulatory agencies in accordance with federal and state laws.

The Medical Rules apply to post-offer applicants and all employees. Application of these rules is based on regulatory requirements and safety standards established by Union Pacific.

## Medical Rules

**Roles and Responsibilities**

**Fitness-for-Duty Evaluations**

**Health and Medical Services Fitness-for-Duty Decisions**

**Medical Records and Confidentiality of Medical Information**

**Dispute Resolution**

**Appendix A: Definitions**

**Appendix B: Reportable Health Events**



EXHIBIT

A

26-40061.298   1/1

# Roles And Responsibilities

The responsibilities of Health and Medical Services, Employees and Post-Offer Applicants with regard to the Medical Rules are outlined below.

˙Top

Health and Medical Services

Employees

Post-Offer Applicants

## Health And Medical Services

Health and Medical Services (HMS) is responsible for establishing the scope, content, frequency, and delivery of medical evaluations. HMS is the final authority for determining an employee's Fitness-for-Duty designation. HMS will respond to supervisor concerns regarding an employee's ability to safely perform duties. HMS may delegate responsibilities to medical professionals not employed by Union Pacific. Delegated responsibilities may include but are not limited to the following:

Performance of medical tests and evaluations; and/or

Determination of medical status, and/or

Determination of functional level

˙Top

## Employees

All employees are responsible for:

Reporting to work fit for duty to safely perform their jobs with or without reasonable accommodations

Notifying the supervisor when the employee becomes aware of or is concerned that a medical condition or symptom(s) exists which may affect his/her ability to safely perform his/her job

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS

Providing, upon request, information from the employees health care provider including, but not limited to: medical documentation pertaining to medical tests, examinations, and/or evaluations, including lists of all prescription and over-the-counter medications taken by the employee. Employee may be required to provide information on a periodic basis for monitoring of continued fitness-for-duty.

Providing, upon request, a statement from the employee's healthcare provider whether or not, or in what circumstances, any prescriptions or OTC medications currently taken by the employee is likely to impair the employee's perceptual abilities or alertness, or impair mental or physical functioning

Performing all work in conformance with any medical restrictions that HMS has placed upon the employee

Meeting the requirements, in a timely manner, of all federal and state laws and regulations applicable to the employee with regard to medical evaluations and testing and the use of personal protective equipment

Providing accurate information to Health and Medical Services regaring health status and medical treatment

**Dispatchers and Operating Department field employees (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), all Telecom employees (agreement and nonagreement) and Supply Department Field employees (agreement and nonagreement) must also:**

Notify HMS as soon as practicable if he/she experiences any of the health events listed in Appendix B of these Medical Rules. A reportable health event is defined as a new diagnosis, recent event or change in a prior stable condition, for one of the following (See Appendix B for more detail): a) Cardiovascular Conditions b) Seizure or Loss of Consciousness c) Significant Vision or Hearing Changes d) Diabetes Treated with Insulin e) Severe Sleep Apnea

The employee should simultaneously notify his/her supervisor that he/she has experienced a health event, as defined in Appendix B, that requires a Fitness-for-Duty evaluation by Health and Medical Services prior to performing his/her job.

If the employee experiences a health event noted in Appendix B, the employee should not report for, or perform, his/her job until Fitness-for-Duty clearance has been provided for such work by HMS

˙Top

## Post-Offer Applicants

12/5/2015

MyUP

Post-offer Applicants are responsible for:

Undergoing a Fitness-for-Duty evaluation, including all medical tests, examinations, and evaluations deemed necessary by various governmental agencies and HMS to determine if the applicant is fit for duty. The Pre-Placement Medical Evaluation and an appropriate Physical Ability Test may be performed after a conditional job offer has been made and before the applicant reports to work

Some costs associated with additional medical testing and evaluations deemed necessary by HMS to determine medical fitness

Providing accurate information to HMS regarding health status and medical treatment

| Issued | 3/1/2011 |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

26-40061.300

Fitness-for-Duty Evaluations

Health and Medical Services

Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Fitness-For-Duty Evaluations

Union Pacific maintains the final authority for determining whether an employee is fit for duty. To determine Fitness-for-Duty, employees may be required to participate in medical tests and evaluations.

Evaluations completed by Health and Medical Services (HMS) may include, but are not limited to various components such as: (1) regulatory medical certification requirements; (2) drug screen; (3) medical, psychological and/or functional evaluations, (4) obtaining additional medical records for review by HMS, and (5) other information as deemed necessary by HMS.

A Fitness-for-Duty evaluation may be initiated by HMS and/or a Supervisor. Employees requesting a Medical Leave may also be required to complete a Fitness-for-Duty Evaluation prior to returning to work or in the event of a change in a Reportable Health Event.

Top

Health and Medical Services Initiated Fitness-for-Duty

Supervisor Initiated

Employee Requested Medical Leave and Reporting Requirements

## Health And Medical Services Initiated Fitness-For-Duty

### REGULATORY MEDICAL EVALUATIONS

Employees with designated job assignments may be required to have Regulatory Medical Evaluations, based on requirements of federal and/or state government regulations.

Applicable government regulations to be used by HMS as references in carrying out regulatory evaluations, may include, but not be limited to, the following:

Federal Motor Carrier Safety Administration (FMCSA)
Compliance with commercial motor vehicle licensing requirement

Federal Aviation Administration (FAA)
Compliance with FAA Regulations for Pilots

Federal Railroad Administration (FRA)
Compliance with medical certification requirements for Locomotive Engineers, Conductors, and Remote Control Locomotive Operators
Compliance with other FRA medical requirement for covered employees
Compliance with Hearing Conservation Program requirements for covered employees

Occupational Safety and Health Administration (OSHA)
Compliance with regulations on worker exposure to potential workplace hazards
Compliance with specific medical certification requirements, including but not limited to, hazardous materials workers and use of respirators and other personal protective equipment

New medical regulatory requirements that come into effect, and apply to Union Pacific employees, will automatically be included in these rules. HMS will apply applicable regulatory requirements regarding medical evaluations for employees. HMS may use additional guidelines or other materials produced by government agencies, or other sources, as references in carrying out regulatory evaluations. For certain jobs or tasks covered by regulatory medical requirements, HMS may utilize medical Fitness-for-Duty requirements that are more rigorous or stringent than the minimal requirements of a regulation.

### Job Transfer

An employee who transfers from an existing Union Pacific job assignment to a different job assignment outside of the provisions of the collective barganining agreement will be evaluated for Fitness-for-Duty before beginning the new job if the transfer is:

a. To a Dispatcher position or an Operating Department field position (including all Transportation, Engineering Services, and Mechanical position - agreement and nonagreement), and/or

b. To a position requiring regulatory certification, and/or

c. To other selected positions, where it is determined that a Job Transfer Evaluation is needed, based on physical and functional requirements of the job

### Pre-placement (post offer) and Return to Work After 1-Year Absence

All post-offer applicants will be required to participate in a Pre-Placement Evaluation after a conditional job offer is made,

26-40061.301        1/3

12/5/2015                                                                MyUP

and before the applicant begins work. All post-offer applicants will be subject to a drug screen and evaluations deemed appropriate by HMS. In addition, some employees may also be subject to Regulatory Medical Evaluations based on requirements of federal and/or state government regulations.

An employee absent from work for a period of 12 months or longer for any medical or non-medical reason, must undergo the requirements of a pre-placement (post-offer) evaluation for the position before returning to work. Absences include, but are not limited to:

    a. On-Duty injury
    b. Off-Duty injury or illness
    c. Employee Assistance Program participation
    d. Reserve Board assignment
    e. Furlough
    f. Personal leave
    g. Military service

**Other**

Additional Fitness-for-Duty Evaluations are conducted whenever it is deemed necessary to determine an Employee's Fitness for Duty on a case-by-case basis.

*Top

## Supervisor Initiated

Supervisor's have the ability to request a Fitness-for-Duty evaluation based on credible information which raises a concern about the employee's ability to safely perform his/her job duties. The Supervisor may remove the employee from service during the review period.

*Top

## Employee Requested Medical Leave And Reporting Requirements

### AGREEMENT EMPLOYEES

The purpose of the Medical Leave Evaluation is to determine the medical appropriateness of an employee's requested leave, due to a medical condition of the employee and ensuring the employee is medically and functionally able to perform his/her job.

Pursuant to Union Pacific policies, an employee must provide adequate medical documentation to verify the need for a medical leave:

Leaves less than 30 days can be approved by the appropriate supervisor without Health and Medical Services review.

Leaves requested for 30 days or more or a leave which becomes extended beyond 30 days, shall be referred to Health and Medical Services for review prior to approval by supervisor.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy on the Employees site for FMLA associated absences also processed by Health and Medical Services.

**Additional requirements for agreement Telecom employees, Supply Department field employees, and Operating Department field employees** (including all Transportation, Engineering Services and Mechanical employees)

All agreement Telecom employees, Supply Department field Employees, and Operating Department field employees (including Transportation, Engineering Services, and Mechanical employees) **must report** the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If an agreement Telecom employee, Supply Department field employee or Operating Department field employee (including all Transportation, Engineering Services, and Mechanical employees) has a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty

26-40061.302

12/5/2015                                                                 MyUP

evaluation prior to employee returning to his/her job.

## NONAGREEMENT EMPLOYEES

All Nonagreement Employees requiring a medical absence should:

See the Short-Term/Long-Term Disability (STD/LTD) policy for Nonagreement for health related absences.

**Additional Requirements for nonagreement Telecom employees, nonagreement Supply Department field employees, and Dispatchers and nonagreement Operating Department field employees** (including all Transportation, Engineering Services, and Mechanical)

All nonagreement Telecom employees, nonagreement Supply Department field employees and Dispatchers and nonagreement Operating Department field employees (including all Transportation, Enginnering Services, and Mechanical) must report the following reportable health events to Health and Medical Services so that a Fitness-for-Duty evaluation can be completed whether or not a Short Term Disability or other medical leave is requested (See Appendix B for more detail):

Cardiovascular Conditions

Seizure or Loss of Consciousness

Significant Vision or Hearing Changes

Diabetes Treated with Insulin

Severe Sleep Apnea

If nonagreement Telecom employees, nonagreement Supply Department field employees, Dispatchers and nonagreement Operating Department field employees (including all Transportation, Engineering Services, and Mechanical) have a reportable health event, at work or off work, the employee must:

**Stay off work** (not report to work or mark up for duty) until Health and Medical Services has completed a Fitness-for-Duty evaluation for the reportable health event and has provided the employee's supervisor with notification that the employee is fit for duty and able to return to work.

**Notify his/her Supervisor** that he/she has had a reportable health event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation prior to employee returning to his/her job.

**Notify Health and Medical Services** that he/she has had a reportable health event that requires a Fitness-for-Duty evaluation prior to employee returning to his/her job.

Family Medical Leave Act (FMLA): See the Family Medical Leave Act (FMLA) policy for FMLA associated absences also processed by Health and Medical Services.

| Issued | 3/1/2011 |
| --- | --- |
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

12/5/2015                                                        MyUP

# Health And Medical Services Fitness-For-Duty Decisions

After a Fitness-for-Duty evaluation is complete, Health and Medical Services determines if the employee/applicant is medically and functionally able to safely perform his/her job and makes the following designations:

Fit for Duty

Fit for Duty - With Restrictions

1. A medical work restriction assigned by Health and Medical Services, may include a requirement that the applicant/employee agree to ongoing monitoring of a specific health condition, with ongoing reporting of such information to Health and Medical Services. The treatment for the specific health condition is conducted by the employee's health care provider.

2. Union Pacific determines whether work restrictions can or cannot be reasonably accommodated.

Not Fit for Duty

Health and Medical Services will notify supervisors of the Fitness-for-Duty designation.

| Issued   | 3/1/2011 |
|----------|----------|
| Latest   | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Medical Records And Confidentiality Of Medical Information

In the regular course of business, Health and Medical Services maintains confidential medical records for post-offer applicants and employees in accordance with applicable federal and state laws. Copies of documentation existing in those files are not released to anyone outside Health and Medical Services, except in the following instances:

When an employee submits a written request to Health and Medical Services which includes his/her name, employee ID, specific documents required, address where the records may be mailed, and the employee's signature.

When Health and Medical Services receives a release of medical information form signed by the employee stating that the employee has agreed the holder of the release may receive specific documentation contained in the employee's confidential Health and Medical Services medical file.

When Health and Medical Services receives a subpoena or other court order instructing the release of specific records.

When relevant documents from an employee's confidential Health and Medical Services medical record are required in order to prepare an appropriate defense of Union Pacific or any of its personnel.

When necessary to evaluate an employee's claim relating to a personal injury or illness if the employee is represented by legal counsel.

When necessary to provide medical information to an external medical practitioner performing an evaluation at Health and Medical Service's request.

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services
Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Dispute Resolution

If Health and Medical Services and the employee's treating medical practitioner disagree on the employee's current medical diagnosis, then the employee may appeal in accordance with applicable collective bargaining agreement(s).

In such an instance, the employee must provide documentation from his/her treating medical practitioner stating the medical justification and procedure(s) used to make the diagnosis.

Upon the Company's receipt of the appropriate medical release authorizing discussion of the employee's medical conditions or case with the appropriate labor union representative and Union Pacific Labor Relations Department representative, the labor union representative, or his designee, may discuss representative(s). If circumstances warrant, Health and Medical Services may request re-evaluation of the employee's case.

Health and Medical Services is the final authority for determining an employee's Fitness-for-Duty designation.

The table below outlines specific circumstances and associated process steps for when there is a disagreement regarding an employee's diagnosis:

| IF ... | THEN ... |
|---|---|
| Re-evaluation by a medical practitioner, selected by Health and Medical Services indicates the employee's medical diagnosis is consistent with the Health and Medical Service's decision. | Health and Medical Services issues a Fitness for Duty decision and the supervisor confirms if reasonable accommodation is possible (if applicable). |
| Re-evaluation by a medical practitioner, selected by Health and Medical Services, indicates the employee's medical diagnosis is NOT consistent with the Health and Medical Service's decision. | Health and Medical Services completes a new medical review and issues an updated Fitness-for-Duty statement and advises the supervisor. The supervisor then notifies the employee. |
| The employee or union representative notifies the supervisor that he/she is not satisfied with re-evaluation results. | The supervisor notifies the appropriate Union Pacific Labor Relations representative. Labor Relations will then arrange a joint conference between the employee's union representative, appropriate treating medical practitioner and Health and Medical Services. (The employee may also be requested to participate if requested by Health and Medical Services.) |
| Consensus is reached at a joint conference between the employee, union representative, employee's appropriate treating medical practitioner and Health and Medical Services representative regarding employee's current diagnosis. | Health and Medical Services issues an updated Fitness for Duty statement to the supervisor, and the supervisor confirms whether reasonable accommodation is possible when work restrictions are applicable. |

# Request To Establish Medical Boards

If consensus is not reached during the joint conference, the employee's union representative may present a request to the appropriate Union Pacific Railroad Labor Relations representative, asking to establish a special medical board in accordance with applicable collective bargaining agreement(s), if any. In general, unless specific collective bargaining agreement provisions require otherwise, a special medical board review is conducted in the following manner:

Each physician selected to participate in the special medical board review must: 1) hold a Doctor of Medicine or Doctor of Osteopathic Medicine degree from an accredited medical school; 2) has practiced medicine for at least five years; and 3) is licensed by a State(s) to practice medicine.

Three physicians are chosen, one each by: 1) Union Pacific Railroad; 2) the Union/Employee; and by 3) joint Union Pacific Railroad and Union/Employee agreement.

A written document is prepared describing the appointment of a special medical board, timeframes for conducting the medical board hearing, limitation of evidentiary record to medical records/history of the involved employee and acceptance of its decision as it pertains specifically to the employee's medical diagnosis as binding, is signed by the employee, the employee's union representative, and the appropriate Union Pacific Railroad official(s).

The employee reports for the scheduled medical evaluation(s).

Within 15 days after evaluation of the employee, the special medical board issues a joint report of finding(s) and decision. One copy of the report is provided to: 1) the Union Pacific Railroad Health and Medical Services Department; 2) the employee's union representative, and 3) the employee.

Once the special medical board makes a finding regarding employee's medical diagnosis, Health and Medical Services will issue an updated Fitness for Duty statement and upon issuance of such statement, the special medical board will

MyUP

automatically terminate. Health and Medical Services is the final authority in determining an employee's Fitness for Duty designation.

All claims for lost time will be handled in accordance with the employee's applicable Collective Bargaining Agreement provisions.

Union Pacific pays for the cost and expenses of its medical representative on the medical board; the union or employee pays for the cost and expenses of its medical representative on the medical board and each party (Union Pacific and Union/Employee) pays 50% of the cost and expenses of the 3rd medical representative on the board.

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

26-40061.307    2/2

# Appendix A: Definitions

The following definitions apply to the Medical Rules:

**EMPLOYEE** – Individual employed by Union Pacific Railroad.

**FITNESS FOR DUTY** – Ability to medically and functionally (including physical, mental, and or cognitive function) safely perform the functions of a job, with or without reasonable accommodations and meet medical standards established by regulatory agencies in accordance with federal and/or state laws.

**HEALTH AND MEDICAL SERVICES (HMS)** – Employees and contracted personnel who provide professional services and make decisions on behalf of Union Pacific's Health and Medical Services.

**POST-OFFER APPLICANT** – Individual who has received a conditional offer of employment, and who is not currently working for Union Pacific. A post-offer applicant is required to undergo a Pre-Placement Medical Screening.

**REASONABLE ACCOMODATIONS** – As required by federal and state law, Union Pacific will make reasonable accommodations for persons with statutorily protected disabilities when this will permit the person to perform the essential functions of the job and does not impose an undue hardship on the company.

**REPORTABLE HEALTH EVENT** – Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees -agreement and nonagreement), Telecom employees (agreement and nonagreement), and Supply Department Field employees (agreement and nonagreement) must report to Health and Medical Services any new diagnosis, recent events, and/or change in the following conditions, cardiac, seizure or loss of consciousness, significant vision or hearing changes, diabetes treated with insulin, and/or severe sleep apnea. (See Appendix B for more information)

**SUPERVISOR** – Employee's first-line supervisor and other supervisors in the employing department.

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Fitness-for-Duty Evaluations

Health and Medical Services

Fitness-for-Duty Decisions

Medical Records and
Confidentiality of Medical
Information

Dispute Resolution

Appendix A: Definitions

Appendix B: Reportable Health
Events

# Appendix B: Reportable Health Events

The Union Pacific Medical Rules state that Dispatchers and employees in Operating Department field positions (including all Transportation, Engineering Services, and Mechanical employees - agreement and nonagreement), Telecom employees (agreement and nonagreement) and Supply Department field employees (agreement and nonagreement) must report the health events to Health and Medical Services listed at the bottom of the page so that a Fitness-for-Duty evaluation can be done to determine if the employee can safely perform his/her job. If an employee has a "Reportable Health Event", at work or off work, then the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event, and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

Reportable health event is defined as a new diagnosis, recent event, or change in a prior stable condition, for one of the following:

**A. Cardiovascular Conditions including:**

1. Heart attack (myocardial infarction) that is confirmed or was suspected (including any Emergency Room or hospital care for chest pain or other symptoms of possible heart disease).

2. Cardiac arrest, requiring cardio-pulmonary resuscitation (CPR) or use of a defibrillator.

3. Serious cardiac arrhythmias (abnormal heart rhythm) requiring medical treatment.

4. Stroke or Transient Ischemic Attack (TIA).

5. Bleeding inside the skull (intracranial) or bleeding inside the brain (intracerebral)

6. Heart surgery or invasive cardiovascular procedures (including coronary bypass graft, cardiac catheterization or angioplasty; or placement of a pacemaker, stent, internal cardiac defibrillator, heart valve or aortic artery graft).

**B. Seizure or Loss of Consciousness including:**

1. A seizure of any kind.

2. Diagnosis of epilepsy (a condition with risk for recurrent seizures).

3. Treatment with anti-seizure medication to prevent seizures.

4. Loss of consciousness (of any duration including episode caused by insulin reaction).

**C. Significant Vision or Hearing Change including:**

1. Significant vision change in one or both eyes affecting visual acuity (if not correctable to 20/40), color vision or peripheral vision (including visual field loss from retinal disease or treatment).

2. Eye surgery (including for glaucoma, cataracts, or laser treatment of the cornea or retina).

3. Significant hearing loss or surgery on the inner ear.

4. New use of hearing aids.

**D. Diabetes Treated with Insulin:**

1. Including Type I and Type II Diabetes Mellitus if insulin is used.

2. Severe hypoglycemic event (defined as a hypoglycemic event with: (a) loss of consciousness, (b) substantial mental confusion, drowsiness, or weakness, or (c) requiring the assistance of another person).

**E. Severe Sleep Apnea:**

1. Diagnosis or treatment of severe obstructive sleep apnea (using CPAP or other treatments).

| Issued | 3/1/2011 |
|---|---|
| Latest | 2/1/2014 |
| Reviewed | 2/1/2014 |

Tab B

**UNION PACIFIC RAILROAD**
5701 West Vickery Boulevard   Fort Worth, Texas
Phone 817-353-7048

**Kurt R. Zalar**    General Superintendent Transportation Services

July 30, 2013

**US CERTIFIED MAIL NO.  7013 1090 0000 0818 4729**
<u>**RETURN RECEIPT ELECTRONIC**</u>

Mr. James R. Bien
21790 Timber Creek Dr
Chandler TX 75758-1062

EID: 0270823 – Thru Frt Conductor

Dear Mr. Bien:

Upon review of medical documentation available to Union Pacific Railroad, Health & Medical Services has determined that you are medically cleared to work with the following work restriction:

1. **You are not to perform jobs requiring color signal recognition.**

**This is to advise this restriction cannot be accommodated.**   If updated medical information is received, we will be glad to have the information reviewed and obtain another fitness-for-duty decision.

If you will be applying for any sickness benefits, you should take a copy of this letter with you.

Sincerely,

Kurt R. Zalar

/cas
cc:    Randall L. Lang, DRO
       Scott H. Bridgman – Emailed
       Scott A. McCoy – Emailed
       Seniority – LotusNotes
       CMSMgrInbound – LotusNotes
       SouthManpower – LotusNotes
       Job Data (RFL/AGR) (LOF/MDQ): _____

www.up.com

**BUILDING AMERICA®**

0270823_Bien_JR_073013R_RTW_Restr_Cannot_Accom.docx

26-40061.310

-- Exhibit B --

Tab C

**UNION PACIFIC RAILROAD**
1400 Douglas Street, STOP 0350
Omaha, Nebraska 68179-0350

**Health & Medical Services**

P 877 275 8747, Option 4

October 13, 2015

Mr. James Bien
21790 Timber Creek Dr.
Chandler, TX 75758
Phone: (903) 520-3009

Re:    Request to reconsider work restrictions and repeat Color Vision Field Test for:

      Employee:    **James R. Bien**

      Employee ID:  **0270823**

      Job Title:    **Conductor**

Dear Mr. Bien:

This letter provides an explanation of the medical work restrictions given to you by Union Pacific Railroad (UPRR), where you have been employed as a train crew member. You have been given permanent work restrictions due to your documented color vision deficiency, which poses significant and imminent safety risks for you and others if you work as a train crew member.

You have recently requested that your work restrictions related to color vision be reconsidered and you have asked to retake the Color Vision Field Test. This letter is to inform you that your request to retake the CVFT has been denied, and your work restrictions will remain in place permanently. Reasons for this decision are given below.

**History of your color vision testing and permanent work restrictions**

**In 2006 vision tests confirmed color vision deficiency**

A review of your employee medical file shows that on 5/17/2006 you had a prior vision exam done for your work as a Radio Control Operator for UPRR. You were given a 24-plate Ishihara color vision test, and missed 17 of the 24 plates; this was a failing score. This color vision testing was done at the University of Texas Health Center at Tyler, TX.

**In 2013 you failed a Color Vision Field Test – and were given permanent work restrictions**

On 3/25/2013 you had vision testing arranged by UPRR Health and Medical Services (HMS) as part of the Conductor and/or Locomotive Engineer certification process that is required every three years by the Federal Railroad Administration (FRA). On that exam you did not meet the FRA minimum threshold criteria for adequate color vision; you missed 3 of the first 11 plates on the Ishihara color vision test (the FRA regulations state that to "pass" the Ishihara 14 plate test, a Conductor or Locomotive Engineer can miss no more than 1 of the first 11 plates.

Because you failed the 14-plate Ishihara test, you were given work restrictions by UPRR that you not perform regular service as a Conductor, Locomotive Engineer, or any other train service job. You then had a Color Vision Field Test (CVFT) conducted by UPRR managers, which is a structured test to determine if a person can correctly identify the colors

www.up.com

**UNION PACIFIC**  **BUILDING AMERICA®**
26-40061.311

-- Exhibit C --

Request to remove work restrictions for James Bien (0270823)     10/13/2015     Page 2 of 3

of railroad wayside train signals in actual field conditions at ¼-mile distance from the signal. The FRA regulations on Conductor and Locomotive Engineer Certification state the railroad can do such additional testing.

You were given a CVFT on 7/25/2013 and you failed the test because you did not correctly identify the colors of all the wayside train signals that were presented. On that CVFT you missed 3 of the colored train signals presented; to pass the CVFT a train crew member must correctly identify the colors of all of the colored train signals that are presented.

Your failure to pass the CVFT documented that you could not correctly identify the colors of wayside train signals, which poses an unacceptable safety risk for work as a train crew member or in other jobs where identification of colored train signals is required.

Therefore, in 2013 you have been given permanent work restrictions that: (1) you cannot do jobs that require accurate identification of colored train signals, and (2) you do not meet FRA medical standards for Conductor or Locomotive Engineer Certification. These permanent work restrictions remain in effect.

On 9/17/2015 you passed a 14-plate Ishihara test – and are asking to retake a CVFT

Also on 9/17/2015 you had an FRA Certification vision exam done at University of Texas Health Center at Tyler, TX. This vision testing had been arranged by UPRR as a FRA Certification vision exam. This vision exam test was done in error; you should not have been allowed to take the FRA Certification vision test, since you were given permanent work restrictions by UPRR in 2013, that you could not work as a train crew member and did not meet the FRA vision criteria to be certified as a Conductor.

The report of the 9/17/2015 test showed that you passed a 14-plate Ishihara color vision test (getting all 14 plates correct). There is no indication on the exam form that you had any history of eye disease for which you had been treated.

**Our review of your request to retake the CVFT and remove color vision work restrictions**

You have asked to repeat a CVFT and have work restrictions related to color vision removed

Because your 9/17/2015 14-plate Ishihara test showed a normal result, you requested that you be allowed to retake the CVFT and have asked that your permanent work restrictions related to color vision be reviewed. You request has been formally reviewed by a committee that reviews all CVFT appeals. .

The committee determined that the CVFT, which you failed in 2013, was a valid test. You failure of the CVFT is also consistent with your prior history of failed Ishihara color vision tests. You have prevented no evidence of any eye condition that would likely have caused you to fail color vision tests in 2013. Therefore, your color vision deficiency is presumed to be hereditary and permanent.

There are multiple reasons a person with significant color vision deficiency can inadvertently pass a 14-plate Ishihara test. However, UPRR considers the CVFT to be a more accurate and definitive test of the ability to identify colors of railroad wayside signals, when compared to clinic based color vision tests such as the Ishihara test. Therefore, your recent passing score on an Ishihara color vision test does not negate or override the finding that you failed a CVFT in 2013.

26-40061.312

Request to remove work restrictions for James Bien (0270823)          10/13/2015     Page 3 of 3

## Your request for a repeat CVFT is denied - Your work restrictions are unchanged

After considering all information, the appeals committee concluded that the results of your failed 2013 CVFT are valid, and your request to retake the CVFT is denied.  Therefore, your work restrictions related to your color vision deficiency will remain in place unchanged and are considered permanent.

Any future reports you may provide of clinic based color vision tests or statements from eye care professionals, which may state your color vision is normal, will not automatically override or refute the findings of your failed CVFT.

HMS will only reconsider your work restrictions for color vision if we receive adequate and valid documentation from an ophthalmologist that: (1) you have had an eye condition that likely contributed to your color vision deficiency, (2) you have received treatment that has resulted in substantial improvement in this eye condition, and (3) clinic based tests show your color vision is and will remain normal.  HMS will evaluate such information if received.

## Conclusions

1.  Your request to retake a Color Vision Field Test is denied.  Your recent passing score on an Ishihara color vision test does not override the results of your 2013 failed Color Vision Field Test.

2.  You continue to have permanent work restrictions that you not do jobs that require accurate identification of colored train signals, based on your failure of a Color Vision Field Test in 2013.

3.  You have provided no adequate evidence that you have any underlying eye disease that has caused your color vision deficiency, so this is assumed to be a hereditary color vision deficiency.

4.  HMS will only reconsider your work restrictions for color vision if we receive documentation from an ophthalmologist that you have had an eye condition that has caused your color vision deficiency, and you have received treatment that has resulted in substantial improvement in this eye condition.

5.  UPRR will not allow you to retake vision exams for FRA Certification in the future.

If you have questions you can contact the HMS Fitness-for-Duty nurse at 402 544-6485.

Sincerely,

*John P. Holland, MD, MPH - CMO (JL)*

John P. Holland, MD, MPH – Chief Medical Officer, Union Pacific Railroad


CC:  1.  Engineer and Conductor Licensing, UPRR Safety Department

26-40061.313

Tab D

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| X FEPA | |
| X EEOC | 440-2020-04246 |

| Texas Workforce Commission - Civil Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| James Bien | 903-520-3009 | 3/30/1973 |

| Street Address | City, State and ZIP Code | Email Address (if applicable) |
|---|---|---|
| PO Box 731, Brownsboro, TX 75756-0731 | | james.bien@yahoo.com |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Union Pacific Railroad Company | 45,000+ | (402) 544-5000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1400 Douglas Street, Omaha, NE 68179 | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

[ ] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN

[ ] RETALIATION   [ ] AGE   [X] DISABILITY   [X] GENETIC INFORMATION

[ ] OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: **July 2013**   Latest: **Present**

[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

## I. STATEMENT OF HARM:

I have been an employee of Union Pacific Railroad Company since 1998. On or about July 2013, I failed Union Pacific's color vision field test and was removed from service as a conductor. On or around April 2014, I was allowed to return to work for Union Pacific, but in a different position, as a manager of crew utilization for less pay. On or around November 2015, I requested reconsideration of the decision to prohibit me from work as a conductor but was denied. My medical records and clinical test results in Union Pacific's possession, including the Ishihara Test for Color Deficiency, contain information about my condition. My medical status did not prevent me from performing my job at Union Pacific. Despite this, Union Pacific placed medical restrictions on me, although no Union Pacific physician ever examined or treated me. The restrictions prohibited me from working as a conductor, and Union Pacific refused to accommodate the restrictions that it imposed on me. As a result, Union Pacific would not allow me to return to my job as a conductor. Union Pacific never allowed to return me to work as a conductor and terminated me from my job as a manager for crew utilization on or about September 2017.

I believe that Union Pacific Railroad Company discriminated against me on the basis of disability and my genetic information.

I also have reason to believe that Union Pacific Railroad Company is engaging in a pattern and practice of discriminating against employees because of their disabilities and genetic information, including, without limitation, by engaging in the following practices; requesting and obtaining information relative to my genetic and/or family medical history; subjecting employees to so-called "medical examinations" by the railroad's Health & Medical Services and using such examinations to take the employees out of service and/or medically disqualify them; failing to engage in an individualized analysis when determining whether employees are qualified to safely perform the essential functions of their jobs; and failing to provide reasonable accommodations to employees who need them.

Since February 19, 2016, there has been a class action pending—*Harris v. Union Pacific Railroad Company*, 2:15-cv-01865-JCC, 8:16cv381-JFB-TDT (filed in the Western District of Washington then transferred to the

1

26-4006 114

member in that case. The filing of a class action tolls the statute of limitations as to all asserted members of the class until class certification is denied or class claims are dismissed. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983). Therefore, as a putative class member, I awaited the outcome of this pending class action and now file my charge pursuing my claims.

II.    <u>RESPONDENT'S REASON FOR ADVERSE ACTION:</u>    I was held out of duty as part of the Union Pacific's fitness-for-duty policy. This reason is unfounded and evidence of discrimination.

III.    <u>I BELIEVE I HAVE BEEN DISCRIMINATED AGAINST ON THE BASIS OF:</u> my actual, perceived, and/or recorded disability, and my genetic and/or family medical history.

---

X_I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – *When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Feb. 26, 2020
_____
Date          *Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(*month, day, year*)

Attorneys for Charging Party:

David E. Schlesinger
Neil D. Pederson
NICHOLS KASTER, PLLP
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 256-3200 (general)
(612) 338-4878 (facsimile)

JENNY BIEN
Notary Public, State of Texas
Comm. Expires 09-14-2020
Notary ID 130821146

2

26-40061.315

Tab E



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Minneapolis Area Office**

330 South Second Avenue, Suite 720
Minneapolis, MN 55401-2224
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Minneapolis Direct Dial: (612) 552-7306
FAX (612) 335-4044
Website: www.eeoc.gov

Charge Number: 440-2020-04246

Mr. James Bien                                                    Charging Party
PO Box 731
Brownsboro, TX 75756

vs.

Union Pacific Railroad Company                                    Respondent
1400 Douglas Street
Omaha, NE 68179

## DETERMINATION

Under the authority vested in me by the Equal Employment Opportunity Commission's ("Commission") Procedural Regulations, I issue the following determination on the merits of the subject charge filed under the Americans with Disabilities Act, as amended (ADA) and the Genetic Information Nondiscrimination Act, of 2008 (GINA).

Respondent is an employer within the meaning of the ADA and GINA, and all requirements for coverage have been met.

The Charging Party alleged that he was discriminated against based on disability and genetic information, in that he was subjected to a prohibited medical inquiry and discharged, in violation of the ADA and GINA.

I have determined that the evidence obtained in the investigation establishes reasonable cause to believe that Respondent discriminated against Charging Party based on disability by subjecting him to a prohibited medical inquiry that was neither job related nor consistent with business necessity based on a perceived disability, then implemented permanent medical restrictions, did not provide reasonable accommodations, and placed him on an indefinite leave of absence in violation of the ADA.

This determination is final. When the Commission finds that violations have occurred, it attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, I invite the parties to join with the Commission in reaching a just resolution of this matter. Disclosure of information obtained by the Commission during the conciliation process will be made only in accordance with the Commission's Procedural Regulations (29 CFR Part 1601.26).

26-00061817

-- Exhibit E --

Determination Letter
Charge No. 440-2020-04246
Page 2 of 2

If the Respondent wishes to accept this invitation to participate in conciliation efforts, please notify Investigator Laura Buss at laura.buss@eeoc.gov or (612)-552-7314 within 14 days.  You are encouraged to include proposed terms for a conciliation agreement.  The remedies for violations of the statutes we enforce are designed to make the identified victims whole, and to provide corrective and preventative relief.  These remedies may include, as appropriate, an agreement by the Respondent not to engage in unlawful employment practices, placement of identified victims in positions they would have held but for discriminatory actions, back pay, restoration of lost benefits, injunctive relief, compensatory and/or punitive damages, and notice to employees of the violation(s) and the resolution of the claim.

Should the Respondent have further questions regarding the conciliation process, or the conciliation terms it would like to propose, please contact the investigator identified above.  Should there be no response from the Respondent within 14 days, we may conclude that further conciliation efforts in this matter would be futile or non-productive.

On Behalf of the Commission,

September 3, 2024                                      *Amrith Kaur Aakre/cad*

_____                    _____
Date                                                            Amrith Kaur Aakre
                                                                   District Director

26-40061.318

Tab F

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Minneapolis Area Office**
330 South Second Avenue, Suite 720
Minneapolis, MN  55401
(800) 669-4000
Website:  www.eeoc.gov

## CONCILIATION FAILURE AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/28/2024

**To:** James Bien
Po Box 731
Brownsboro, TX 75756
Charge No: 440-2020-04246

EEOC Representative and email:    LAURA BUSS
Enforcement Supervisor
laura.buss@eeoc.gov

### CONCILIATION FAILURE OF CHARGE

To the person aggrieved: This notice concludes the EEOC s processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2020-04246.

On behalf of the Commission,

Digitally Signed By:Cherie Doak
10/28/2024
Cherie Doak
Area Office Director

26-40061.319

-- Exhibit F --

**Cc:**
Benton Bond
UNION PACIFIC
1400 Douglas St
Omaha, NE 68179

Please retain this notice for your records.

26-40061.320

Tab 4

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

JAMES BIEN, § 
§ 
*Plaintiff*, § 
§ 
v. § Civil Action No. 4:25-cv-74
§ Judge Mazzant
UNION PACIFIC RAILROAD § 
COMPANY, § 
§ 
§ 
*Defendant*. § 

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion to Dismiss Plaintiff's Amended

Complaint (the "Motion") (Dkt. #16). Having considered the Motion, the relevant pleadings, and

the applicable law, the Court finds Defendant's Motion to Dismiss Plaintiff's Amended Complaint

(Dkt. #16) should be **GRANTED**.

## BACKGROUND

### I.    Factual Background

Plaintiff James Bien ("Plaintiff") brings this disability discrimination suit against his

employer, Defendant Union Pacific Railroad Company ("Defendant") (Dkt. #31).[1] In 1998,

Defendant hired Plaintiff as a switchman and brakeman (Dkt. #31 at ¶¶ 8–10). Plaintiff later

assumed a conductor role (Dkt. #31 at ¶¶ 8–10).  Prior to and throughout his employment, Plaintiff

underwent various color vision tests, often failing an Ishihara color vision test before passing a

---

[1]  On January 24, 2025, Plaintiff filed the instant lawsuit against Defendant (Dkt. #1). On August 15, 2025, Plaintiff
filed his Third Amended Complaint (Dkt. #31), in which Plaintiff excluded his previously asserted failure-to-
accommodate claim against Defendant (Dkt. #17 at p. 12). The Court considers the allegations made in Plaintiff's
Third Amended Complaint (Dkt. #31) for the purpose of summarizing a factual background and making its
determinations on the issues raised in the instant Motion.

secondary color vision test (Dkt. #31 at ¶¶ 9–11). Plaintiff continued his employment as a conductor for nearly fifteen years, working ably and safely (Dkt. #31 at ¶ 10).

In 2013, as part of his Federal Railroad Administration ("FRA") certification to work as a conductor, Plaintiff took an Ishihara color vision test which he failed (the "2013 Ishihara Color Vision Test") (Dkt. #31 at ¶ 16). Subsequently, on July 25, 2013, Union Pacific required Bien to take a color vision field test, which Plaintiff contends is unreliable, inaccurate, and does not replicate Plaintiff's working conditions (Dkt. #31 at ¶¶ 18, 21). Plaintiff failed this secondary test (Dkt. #31 at ¶ 22).

On July 29, 2013, Plaintiff was informed he was being removed from service as a conductor (the "2013 Work Restriction") (Dkt. #31 at ¶ 27). Through a letter dated July 30, 2013, Defendant notified Plaintiff that he was restricted from working jobs that required color signal recognition and that this restriction could not be accommodated, thus ending his employment as a conductor (the "2013 Letter") (Dkt. #31 at ¶¶ 27–28; Dkt. #31 at p. 29). Plaintiff admits that he also failed another color vision field test administered on August 20, 2013 (Dkt. #31 at ¶ 29). After several months of unemployment, Defendant hired Plaintiff as a Manager of Crew Utilization for less pay (Dkt. #31 at ¶ 37).

After Defendant imposed its work restriction on Plaintiff, on February 1, 2014, Defendant's updated "Medical Rules" went into effect, which outlined its Fitness-for-Duty Evaluations (Dkt. #31 at ¶ 13, pp. 17–28). These evaluations were intended to assess an employee's ability to safely perform the essential functions of that employee's job (Dkt. #31 at ¶¶ 13–14). Plaintiff alleges the Medical Rules impose a "rigid and formulaic approach to assessing the abilities of persons with

2

disabilities," and these assessments unfairly determine what "standardized work restrictions" Defendant can impose on an employee (Dkt. #31 at ¶ 14).

In August or September of 2015, Plaintiff received a notification from Defendant about performing a FRA recertification physical (Dkt. #31 at ¶ 38). On September 17, 2015, Plaintiff took and passed an Ishihara color vision test (the "2015 Ishihara Color Vision Test") (Dkt. #31 at ¶¶ 38–39). Based on this event, Plaintiff asked Defendant to have his medical information reviewed, to let him retake the color vision field test, to reconsider the 2013 Work Restriction, and to reinstate him as a conductor (Dkt. #31 at ¶ 40).

Defendant informed Plaintiff, through a letter dated October 13, 2015 (the "2015 Letter"), that the 2015 Ishihara Color Vision Test was "done in error," and he "should not have been allowed to take the FRA Certification vision test, since [he was] given permanent work restrictions by [Defendant] in 2013" (Dkt. #31 at pp. 30–32). The 2015 Letter further communicated that Defendant was denying Plaintiff's request to retake the color vision field test and that Plaintiff will "continue to have permanent work restrictions that [he] not do jobs that require accurate identification of colored train signals, based on [his] failure of a Color Vision Field Test in 2013" (Dkt. #31 at p. 31).

## II.    Procedural History

Plaintiff was not the only litigant to take issue with Defendant's revision of the Fitness-for-Duty evaluations and its effects on their employment.[2] On February 19, 2016, several of Defendant's employees who had been removed from their positions following their failing of an

---

[2] Indeed, days before Plaintiff filed the instant lawsuit, a similar case was filed—*Jeffrey Todd Cooley v. Union Pacific Railroad Company*, Civil Docket No. 4:25-cv-56. Both cases before the Court involve Defendant, raise similar claims, and involve a similar statute of limitations issue. In the *Cooley* case, on November 3, 2025, the Court granted Defendant's Motion to Dismiss, and the case was closed. The *Cooley* plaintiff has since moved for reconsideration.

26-40061.531

assessment filed a lawsuit against Defendant alleging, *inter alia*, that Defendant's Fitness-for-Duty evaluations and subsequent employment decisions violated the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.* (the "ADA") (Dkt. #31 at ¶ 47). *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 621 (D. Neb. 2019), *rev'd*, 953 F.3d 1030 (8th Cir. 2020). The proposed *Harris* class was defined as follows:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with [Defendant] for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

*Id.*

On February 5, 2019, the United States District Court of Nebraska certified the *Harris* class to more narrowly consist of: "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." 329 F.R.D. at 628. Defendant filed an interlocutory appeal of this class certification, and on March 24, 2020, the United States Court of Appeals for the Eighth Circuit reversed the certification. *Harris*, 953 F.3d at 1039. The instant lawsuit comes to this Court following this decertification.

On April 10, 2020, less than a month after the *Harris* class was decertified, Plaintiff dual-filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (the "EEOC") and the Texas Workforce Commission (Dkt. #31 at ¶ 52). On September 3, 2024, the EEOC provided Plaintiff with a determination letter (Dkt. #31 at ¶ 53). On October 28, 2024, the EEOC provided Plaintiff with a right to sue letter (Dkt. #31 at ¶ 54). On January 24, 2025, Plaintiff filed the present suit against Defendant (Dkt. #1). Plaintiff amended his complaint twice,

4

ultimately alleging Defendant was liable for disparate treatment under the ADA (Dkt. #1; Dkt. #13; Dkt. #31).

In his Third Amended Complaint (the "Complaint"), Plaintiff asserts the following regarding the *Harris* class action: (1) Plaintiff was a putative class member in the *Harris* case; (2) Plaintiff's claims against Defendant accrued after September 18, 2014; and (3) the *Harris* class action tolled the statute of limitations period for his claims against Defendant asserted herein from September 18, 2014 through March 24, 2020 (Dkt. #31 at ¶¶ 47–49). Because of the tolling period, Plaintiff now asserts two disability discrimination claims under the ADA and specifically alleges disparate treatment (Dkt. #31 at ¶¶ 56–74). On March 25, 2025, Defendant filed the instant Motion, arguing Plaintiff's ADA claims are time-barred (Dkt. #16). Plaintiff responded, and Defendant replied (Dkt. #17; Dkt. #18). The Motion is now ripe for adjudication.

## LEGAL STANDARD

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that

5

are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).

6

## ANALYSIS

Defendant urges the Court to dismiss Plaintiff's claims because they are time-barred (Dkt. #16 at pp. 8–13). Additionally, Defendant argues Plaintiff fails to state a claim based upon an "actual" or "record of" disability (Dkt. #16 at pp. 6–8, 13–15). The Court considers each argument in turn.

### I.    Timeliness of Plaintiff's ADA Claims

Plaintiff brings claims for disparate treatment under the ADA, 42 U.S.C. §§ 12112(a), 12112(b)(6) (Dkt. #31 at ¶¶ 56–74). Defendant argues Plaintiff has failed to timely comply with the ADA's administrative prerequisites prior to commencing this action. Under the ADA, a plaintiff must exhaust their administrative remedies against their employer before pursuing their claims in federal court. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) (citing 42 U.S.C. § 2000e-5(e)(1)). To do so, the plaintiff must file a charge of discrimination with the EEOC or with a state or local agency with authority to grant or seek relief from the alleged unlawful employment practice within 300 days of the alleged discriminatory act. *Id.*; 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(e)).

Here, the applicable limitations period for Plaintiff's ADA disparate treatment claims began to run from the time Plaintiff knew or reasonably should have known that Defendant's challenged conduct occurred. *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 878 (5th Cir. 2003) (citing *Vadie v. Miss. State Univ.*, 218 F.3d 365, 371 (5th Cir. 2000)). However, under *American Pipe & Const. Co. v. Utah*, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. 538, 554 (1974). A district court's certification of a class therefore establishes "the pertinent class definition" so that each class

member's claims are tolled "until the class is decertified or the case is otherwise resolved." *Zaragoza v. Union Pac. R.R. Co.*, 112 F.4th 313, 319 (5th Cir. 2024) (determining that plaintiff's claims were tolled because he failed a vision test that "at least suggested" he was covered by the class definition).

Defendant argues that Plaintiff failed to timely comply with the ADA's administrative prerequisites prior to filing suit.  Specifically, Defendant argues Plaintiff's claims are time-barred for two reasons: (1) he was never a member of the *Harris* class, meaning the limitations period continued to run; and (2) even if he was initially a member of the *Harris* class, Plaintiff was unambiguously excluded from the class when the class was certified on February 5, 2019 (Dkt. #16 at p. 8). In contrast, Plaintiff contends his discrimination claims against Defendant should benefit from the tolling period because his claims accrued after September 18, 2014 — during the tolling period created by the *Harris* case (Dkt. #31 at ¶¶ 63–64; Dkt. #17 at pp. 5–7). Specifically, Plaintiff argues his claims are based on the adverse actions taken by Defendant on October 13, 2015, conveyed through the 2015 Letter, when Defendant allegedly made a *new* decision pertaining to Plaintiff's Fitness-for-Duty (Dkt. #17 at p. 5). Plaintiff contends this subsequent decision imposes consequences that were more severe than those imposed through the 2013 Work Restriction (Dkt. #17 at p. 5). Finally, Plaintiff avers that Defendant's 2015 Letter communicated a *permanent* restriction from his job as a conductor (Dkt. #17 at p. 5).

Again, the tolling period created by the two *Harris* class definitions spanned from September 18, 2014 to March 24, 2020. *Harris*, 953 F.3d at 1039. To determine whether Plaintiff benefitted from the tolling period in *Harris*, the Court must determine whether Plaintiff was included in the *Harris* class, and if so, for how long.

8

"A class is initially defined by the plaintiffs via their complaint." *Zaragoza*, 112 F.4th at 318 (citing *American Pipe*, 414 U.S. at 554). "As class actions progress, plaintiffs may expand, narrow, or otherwise refine their action by filing amended pleadings." *Id.* With respect to tolling,

> [W]hen a district court certifies a class, that certified class becomes the pertinent class definition. Further, the class definition persists through appeal. A subsequent decertification of that class, either by the district court or the appellate court, ends tolling going forward but does not affect the earlier class certification for tolling purposes.

*Id.* at 319 (footnotes omitted).

### A.   Plaintiff was a member of the *Harris* class, as initially defined by the putative class.

First, the Court must determine whether Plaintiff was included in the proposed class definition of the then-operative complaint in *Harris*, which defined the putative class as follows:

> Individuals who were removed from service over their objection, and/or suffered another *adverse employment action*, during their employment with [Defendant] for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

329 F.R.D. at 621 (emphasis added).

Here, the parties agree that the operative date at issue is September 18, 2014, which is 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination (Dkt. #16 at p. 9; Dkt. #17 at p. 7). Thus, September 18, 2014, is the start of the tolling period. However, Defendant argues the original *Harris* class definition was limited to individuals removed from service on or after September 18, 2014 (Dkt. #16 at p. 9). Based on Plaintiff's own pleadings, Defendant argues he was removed from service as a conductor on July 29, 2013—the 2013 Work Restriction—which was before the operative date and thus, he cannot be included in the *Harris* class (Dkt. #16 at pp. 9–10; Dkt. #31 at ¶ 27). In contrast, Plaintiff argues the initial class definition

9

in *Harris* included Plaintiff because he was subjected to an adverse employment action for reasons related to a Fitness-for-Duty evaluation *after* September 18, 2014 (Dkt. #17 at p. 7). Specifically, Plaintiff's passed the 2015 Ishihara Color Vision Test before receiving the 2015 Letter, through which Defendant refused Plaintiff's request to retake a secondary color vision field test. Plaintiff argues this *decision* on October 13, 2025, was a discrete adverse employment action directly related to a Fitness-for-Duty evaluation (Dkt. #17 at p. 7).

The parties do not direct the Court to any case law suggesting that Defendant's denial of Plaintiff's request to reconsider the 2013 Work Restriction is or is not an adverse employment action. Thus, the Court, by accepting as true all well-pleaded facts in the Complaint and viewing those facts in the light most favorable to Plaintiff, agrees with Plaintiff. *Bowlby*, 681 F.3d at 219. Plaintiff was mistakenly ordered to take the 2015 Ishihara Color Vision Test and passed it (Dkt. #31 at ¶¶ 38–39). Based on this event, Plaintiff asked Defendant to have his medical information reviewed, to let him retake the color vision field test, to reconsider the 2013 Work Restriction, and to reinstate him as a conductor (Dkt. #31 at ¶ 40). Because Defendant denied these requests after September 18, 2014, Plaintiff suffered an *adverse employment action*, as he alleges (Dkt. #31 at pp. 30–32).

Therefore, Plaintiff's ADA disability discrimination claim was tolled through this initial putative class definition.

### B. Although he was initially a member of the *Harris* class, Plaintiff was unambiguously excluded from the revised class definition.

Second, the Court must determine if Plaintiff was included under the revised class definition in *Harris*, as certified, thereby tolling his ADA claims until the *Harris* class was decertified on March 24, 2020. 953 F.3d at 1039. As stated before, the *Harris* district court certified

10

a class of plaintiffs including: "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014, until the final resolution of this action." 329 F.R.D. at 628. Plaintiff's inclusion in the *Harris* class under *American Pipe* hinges on whether he was "subject to a fitness-for-duty examination" that occurred "as a result of a reportable health event." *Harris*, 329 F.R.D. at 628; *American Pipe*, 414 U.S. at 554.

Zaragoza is instructive to the Court's analysis. *See* 112 F.4th at 321. In that case, the Fifth Circuit considered whether an employee's failure to pass an Ishihara color vision test determined that employee's inclusion in the *Harris* class. *Id.* at 319. The Fifth Circuit held the plaintiff's first instance of failing the Ishihara color vision test "met the definition of a 'reportable health event'" under the *Harris* class definition. *Id.* at 321. The secondary light cannon test was therefore a "fitness-for-duty examination as a result of a reportable health event," and not the "reportable health event" itself. *Id.* Unlike Plaintiff, the plaintiff in *Zaragoza* failed both the Ishihara test and the secondary vision test in 2016—almost two years *after* the tolling period began on September 18, 2014, for the *Harris* class; therefore, the plaintiff in *Zaragoza* was included in the *Harris* class definition and enjoyed the tolling of his claims. *Id.*

Here, Defendant argues Plaintiff was not subject to a fitness-for-duty examination as a result of a reportable health event after September 18, 2014 (Dkt. #16 p. 11). Specifically, Defendant contends that when Plaintiff failed the 2013 Ishihara Color Vision Test, Defendant imposed the 2013 Work Restriction, which was a the permanent, involuntary removal of Plaintiff from his job as a conductor (Dkt. #16 at p. 11). Thus, as Defendant asserts, because Plaintiff's removal from service as a conductor on July 29, 2013 occurred *prior to* the start of the tolling period—September 18, 2014—Plaintiff is excluded from the *Harris* class as certified (Dkt. #16 at

11

p. 11). In contrast, Plaintiff contends that the 2015 Ishahara Color Vision Test he passed was the "reportable health event" at issue, as it indicated a new diagnosis of a possible vision change (Dkt. #17 at p. 10). Plaintiff argues that as a result of this event he was subject to a new Fitness-for-Duty "decision" on October 13, 2015, which is when Defendant determined the 2013 Work Restriction would remain in place (Dkt. #17 at p. 11). Because this "decision" occurred after September 18, 2014, Plaintiff argues "his claims were tolled from the time they accrued in 2015 until the *Harris* class was decertified by the [Eighth] Circuit on March 24, 2020"—meaning his charge of discrimination, which was filed less than a month after the *Harris* class was decertified, was timely. (Dkt. #17 at p. 11).

In its reply, Defendant directs the Court to the phrase "fitness-for-duty *examination*" as used in the narrowed *Harris* class definition (Dkt. #18 at p. 2). Defendant emphasizes that the court that certified the *Harris* class did not use the phrase "fitness-for-duty *decision*," as Plaintiff now ask the Court to use, but instead used the term "examination" (Dkt. #18 at p. 2). Moreover, Defendant's own Medical Rules includes a section titled "Health and Medical Services Fitness-for-Duty Decisions," which states: "[a]fter a Fitness-for-Duty *evaluation* is complete, Health and Medical Services determines if the employee/applicant is medically and functionally able to safely perform his/her job and make the following designations: Fit for Duty, Fit For Duty – with Restrictions, or Not Fit for Duty" (Dkt #31 at p. 23) (citation modified).

To begin with its analysis, given that Plaintiff previously failed the 2013 Ishihara Color Vision Test which triggered a secondary test and the 2013 Work Restriction, the Court finds that his passing the 2015 Ishihara Color Vision Test, even if it was mistakenly administered, could be considered as a "reportable health event" (Dkt. #31 at ¶¶ 38–39). *See Zaragoza*, 112 F.4th at 321.

26-40061.540

However, unlike the *Zaragoza* plaintiff who failed two tests—first, the Ishihara test, which was the "reportable health event," followed by, the light cannon test, being the "fitness-for-duty examination"— Plaintiff never underwent a "fitness-for-duty examination" or any secondary color-vision test that was triggered by the 2015 Ishihara Color Vision Test any time after September 18, 2014. *See Zaragoza*, 112 F.4th at 321. Indeed, after Plaintiff passed the 2015 Ishihara Color Vision Test, marking the "reportable health event," he asked Defendant to let him take a secondary color vision field test, which could have been a "fitness-for-duty examination," but Defendant refused this request (Dkt. #31 at ¶¶ 38–40). Instead, Defendant advised Plaintiff the 2015 Ishihara Color Vision Test was "done in error," and he "should not have been allowed to take the FRA Certification vision test, since [he was] given permanent work restrictions by [Defendant] in 2013" (Dkt. #31 at p. 31). The 2015 Letter communicated that Defendant was denying Plaintiff's request to retake the color vision field test and that Plaintiff will "continue to have permanent work restrictions that [he] not do jobs that require accurate identification of colored train signals, based on [his] failure of a Color Vision Field Test in 2013" (Dkt. #31 at p. 31).

The Court agrees with Defendant that Plaintiff cannot use evaluation and decision interchangeably. Defendant's Medical Rules draw a distinction between a Fitness-For-Duty Evaluation and a Fitness-For-Duty Decision (Dkt. #31 at pp. 20–23). Notably, an "examination" is included as a potential requirement under a fitness-for-duty evaluation, while a fitness-for-duty decision is defined as Defendant's Health and Medical Services determining if an employee is medically and functionally able to perform their job *after* a fitness-for-duty evaluation (Dkt. #31 at pp. 20–23).

13

Moreover, the plaintiffs in the *Harris* class proposed the narrower definition of the revised class, which used the word "examination" rather than "evaluation" as in the first definition. *See DeFries v. Union Pac. R.R. Co.*, 104 F.4th 1091, 1102 (9th Cir. 2024) (analyzing *Harris*), *cert. denied*, 145 S. Ct. 1426 (2025). Defendant's Medical Rules were "incorporated by reference into the class definition," which was narrowed to correspond to a smaller list of relevant individuals identified by Defendant in discovery. *Id.* at 1102, 1105. To read fitness-for-duty "examination" and fitness-for-duty "decision" interchangeably would broaden the definition of the revised *Harris* class in contrast to the way it was originally narrowed by the *Harris* plaintiffs. The Court finds that while Plaintiff may have undergone a reportable health event when he passed the 2015 Ishihara test, this did not trigger a secondary vision test like in *Zaragoza*, and Plaintiff was never subjected to a fitness-for-duty examination. Further, the 2015 Letter attached to Plaintiff's Complaint is clear—this was not a secondary examination or a subsequent evaluation made by Defendant. Indeed, Plaintiff was already restricted from working as a conductor when he took the 2015 Ishihara Color Vision Test and this would continue, meaning the 2015 Letter merely conveyed that Plaintiff's status quo would continue.

Plaintiff was therefore excluded from the revised *Harris* class definition as initially certified on February 5, 2019. 329 F.R.D. at 628. Therefore, his disability discrimination claims were only tolled from the time they accrued until February 5, 2019. *Harris*, 329 F.R.D. at 628; *see also American Pipe*, 414 U.S. at 554. As a result, Plaintiff's 300-day window to seek the proper administrative remedies for this cause of action closed on December 2, 2019. *See* 42 U.S.C. § 12117. As previously noted, Plaintiff did not file his Charge of Discrimination until April 10, 2020 (Dkt. #13 at ¶ 41; Dkt. #31 at ¶ 52). Consequently, because Plaintiff was excluded from the certified

14

26-40061.542

class in *Harris* on February 5, 2019, and he failed to timely comply with the ADA's administrative prerequisites prior to commencing this action, Plaintiff's claims under the ADA are time-barred.

Accordingly, because Plaintiff's disparate treatment claims are time-barred, the Court finds that Plaintiff has failed to state a plausible claim for relief under Rule 12(b)(6), and Defendant's Motion should therefore be **GRANTED**.

## II.    Remaining Issues

Defendant raises the following additional arguments in its Motion: (1) Plaintiff failed to exhaust his administrative remedies (Dkt. #16 at pp. 6–8); and (2) Plaintiff fails to state a claim based upon an "actual" or "record of" a disability (Dkt. #16 at pp. 13–15). These arguments are now moot. The Court has determined that Plaintiff's disability discrimination claims are time-barred under the ADA, so any argument related to exhausting administrative remedies and pleading deficiencies in those claims does not affect the Court's determination.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. #16) is hereby **GRANTED** and the case is hereby **DISMISSED** with prejudice.

All pending motions not previously addressed by the Court are **DENIED** as moot, and the Clerk is directed to **CLOSE** this civil action.

**IT IS SO ORDERED**.

**SIGNED this 2nd day of January, 2026.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

15

26-40061.543